## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

SOUTH CAROLINA STATE CONFERENCE OF
THE NAACP;

       *Plaintiff,*

    v.

TONNYA K. KOHN, in her official capacity
as South Carolina State Court
Administrator;

DONALD W. BEATTY, in his official capacity
as Chief Justice of the South Carolina
Supreme Court;

       *Defendants.*

Case No.:  3:22-cv-01007-MGL

**Complaint for Declaratory and
Injunctive Relief**

## INTRODUCTION

1.     In this action, the South Carolina State Conference of the NAACP ("South Carolina NAACP") challenges the South Carolina Court Administration's categorical prohibition against automated data collection—*i.e.*, "scraping"—on the Public Index, the county-by-county repository of legal filings in the state of South Carolina. Scraping the Public Index's eviction filings is a vital means through which the South Carolina NAACP can prevent evictions, help people achieve meaningful access to the courts, and pursue the South Carolina NAACP's advocacy mission. The South Carolina NAACP has a protected First Amendment right to access and record these public court records for these purposes. But Court Administration's absolute prohibition on scraping unreasonably restricts that right. For these reasons, the South Carolina NAACP asks the Court to declare that Defendants' prohibitions on scraping violate the First Amendment and to enjoin their future enforcement against the South Carolina NAACP.

2.      South Carolina faces a statewide eviction crisis. South Carolina counties account for 12 of the 20 highest eviction rates in the nation.[1] Among these counties are some of South Carolina's most populous, like Richland, Berkeley, and Anderson.

3.      Once an eviction action is filed, tenants find themselves at risk of rapidly losing their homes, often without a chance to exercise their legal rights.

4.      Of particular relevance to the South Carolina NAACP, Black renters are disproportionately evicted from their homes as compared to other tenants. For example, a 2020 study of 1.44 million eviction cases showed that Black renters represented 32.7 percent of all eviction filings despite comprising only 19.9 percent of all adult renters.[2] Data also show that women are disproportionately evicted relative to male renters.[3]

5.      Evictions result in cascading harms for tenants, their families, and the communities in which they live, leading to homelessness, negative impacts on health, poor educational and employment opportunities, and entrenched poverty.

6.      In response to the eviction crisis and its consequences for South Carolina's tenants, the South Carolina NAACP launched a Housing Navigator Program. The Navigator Program provides free eviction-prevention services, investigates and responds to community-

---

[1] Joseph P. Williams, *Communities with the Highest Eviction Rates*, U.S. News & World Rep. (Sept. 23, 2020), https://www.usnews.com/news/healthiest-communities/slideshows/counties-with-the-highest-eviction-rates-in-the-us ("Two Southern states, South Carolina and Virginia, dominate when it comes to communities with the highest eviction rates.").

[2] Hepburn, Peter, Renee Louis & Matthew Desmond, *Racial and Gender Disparities Among Evicted Americans*, 7 Socio. Sci 649, 653 (Dec. 2020), https://sociologicalscience.com/download/vol-7/december/SocSci_v7_649to662.pdf.

[3] *Id.* at 654–55; *see also* Matthew Desmond, *Poor Black Women Are Evicted at Alarming Rates, Setting Off a Chain of Hardship*, MacArthur Found. (March 2014), https://www.macfound.org/media/files/hhm_research_brief_-_poor_black_women_are_evicted_at_alarming_rates.pdf ("Poor black men may be locked up, but poor black women are locked out. Both phenomena work together to propagate economic disadvantage in the inner city.").

wide patterns of eviction filings, and advocates for greater access to fair housing and more just eviction policies, including through potential Fair Housing Act litigation. When the Navigator Program becomes aware of an eviction proceeding, it provides resources to individuals and families facing eviction, including information about legal and nonlegal services and alternative affordable housing opportunities.

7.      To prevent more evictions and strengthen its advocacy, the South Carolina NAACP seeks to use an automated data collection technique known as "scraping" to gather and record information that is publicly available on the court Public Index.

8.      Scraping does not involve breaking into a system or website to access information that is otherwise unavailable to the user. Scraping merely automates the process used to manually collect information from a website: entering a query, identifying the relevant information, and retrieving that information.

9.      Scraping is widely employed by researchers, reporters, and watchdog groups to capture and evaluate population-level data on websites which would be impracticable to collect using manual methods. Responsible scraping does not interfere with a website's functionality.

10.      Although scraping websites is commonplace nationwide, Plaintiff faces two discrete barriers to scraping South Carolina's Public Index.

11.      First, the terms of service of the Public Index expressly prohibit using "site data scraper[s] or any similar software." Because the Public Index is a creation of South Carolina Court Administration, whose administrative head is the Chief Justice of the Supreme Court, any member of the South Carolina bar who violates the terms of service of the Public Index is subject to potential discipline, including disbarment.

12.      Second, South Carolina Court Administration also uses technical means to prevent scraping. These technical prohibitions identify automated activity on the Public Index and freeze access to the browser that is querying the site. The technical prohibitions are overbroad, and are not tailored to protecting the security or usability of the website.

13.    Without being able to scrape the Public Index, the South Carolina NAACP—through its Housing Navigator Program and its local branches—cannot meaningfully access the Public Index to obtain information necessary to pursue its advocacy efforts and to provide eviction services to tenants.

14.    Court Administration's prohibition on scraping violates the First Amendment insofar as it unreasonably restricts access to, and use of, public information, and prohibits recording public information in ways that enable subsequent speech and advocacy, including advocacy in the courts.

15.    The South Carolina NAACP therefore brings this action seeking declaratory and injunctive relief to prevent Defendants from enforcing their terms of service and technical prohibitions on scraping the Public Index against the South Carolina NAACP.

## PARTIES

**Plaintiff**

16.    Plaintiff South Carolina State Conference of the NAACP is a nonprofit, nonpartisan membership organization in South Carolina. The South Carolina NAACP is a state conference of branches of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. The South Carolina NAACP was chartered in 1939 and is the oldest civil rights group in South Carolina.

**Defendants**

17.    Defendant Tonnya K. Kohn is the State Court Administrator and Director of Court Administration for the South Carolina Judicial Branch. Because the injunctive relief sought by Plaintiff would run against her office, Ms. Kohn is named as a defendant in her official capacity.

18.    Defendant Donald W. Beatty is the Chief Justice of the South Carolina Supreme Court. As such, he is the administrative head of the state judicial system. S.C. Const. art. V, § 4.

Because the injunctive relief sought by Plaintiff would run against his office, Chief Justice Beatty is named as a defendant in his official capacity.

## JURISDICTION AND VENUE

19.    Plaintiff's claims are brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

20.    This Court has jurisdiction to hear Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

21.    Venue is proper in the United States District Court for the District of South Carolina under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit occurred principally in this judicial district. This District is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district.

22.    Venue is proper in the Columbia division under Local Rule 3.01 because a substantial portion of the events or omissions giving rise to the claims occurred in this division.

## STATEMENT OF FACT

### A.    South Carolina's Eviction Crisis

23.    South Carolina is in the throes of an eviction crisis. It is the state with the highest rates of eviction in the country.[4] In fact, 47 of the 100 cities and counties with the highest eviction rates in the United States are in South Carolina.[5]

24.    In addition to socio-economic factors like high poverty rates and limited

---

[4] *Understanding Evictions in South Carolina*, Eviction Lab, https://evictionlab.org/map/#/2016?geography=states&bounds=-126.373,18.884,-57.477,61.529&type=er&locations=45,-80.899,33.919 (last visited Mar. 23, 2022);  Scott Morgan,  *"Normal's Already a Crisis": Why South Carolina's Appetite for Eviction Scares Housing Advocates*, S.C. Pub. Radio (July 20, 2021), https://www.southcarolinapublicradio.org/sc-news/2021-07-20/normals-already-a-crisis-why-south-carolinas-appetite-for-eviction-scares-housing-advocates.

[5] Morgan, *supra* note 5.

affordable housing, South Carolina's eviction laws and processes make tenants particularly vulnerable to eviction.

25.    For example, unlike in other states, tenants in South Carolina must expressly request a hearing before a magistrate judge prior to eviction. Tenants whose landlords file to evict them must respond to an Order to Show Cause and request a hearing within 10 days. If they do not do so, they forfeit their hearing, and the magistrate judge will automatically issue a writ of ejectment against them. *See* S.C. Code § 27-37-40.

26.    Most tenants do not know that they are entitled to a hearing but must request it.[6] And because tenants do not have a right to counsel, they often default on their eviction actions without ever consulting an attorney or exercising their legal rights.

27.    The COVID-19 pandemic has made underlying housing instability in South Carolina even more acute. The economic shock at the start of the pandemic forced thousands of tenants in South Carolina to the brink of eviction.

28.    That precarity continues today. Low income tenants in South Carolina face rising rents, limited wage growth, and discriminatory housing practices.

29.    Black tenants are particularly at risk of eviction. In general, Black renter households are more likely to spend over 50 percent of their income on housing, making them more susceptible to falling behind on rental payments.[7] They also have less access to eviction prevention services, like lawyers or even financial assistance. Nationwide, Black tenants account

---

[6] *See* Thad Moore, *SC's Only Major Attempt to Fix North Charleston's Eviction Crisis Isn't Enough*, Post & Courier (Nov. 16, 2021), https://www.postandcourier.com/business/real_estate/sc-s-only-major-attempt-to-fix-north-charleston-s-eviction-crisis-isn-t-enough/article_68bb54d4-3bda-11eb-83d9-832a639530db.html.

[7] Sophia Weeden, *Black and Hispanic Renters Face Greatest Threat of Eviction in Pandemic,* Joint Ctr. Hous. Stud. Harv. Univ. (Jan. 11, 2021), https://www.jchs.harvard.edu/blog/black-and-hispanic-renters-face-greatest-threat-eviction-pandemic.

for 35 percent of all evictions, even though they comprise just 21 percent of all renters.[8] For Black women, these disparities are particularly dire: Black women and their families are more than twice as likely to face eviction compared to white households.[9]

30.     COVID-19 has made Black tenants in South Carolina even more vulnerable to eviction. Recent Census data shows that nationally, over 30 percent of Black women were behind in rent as of December 2021; in South Carolina, nearly one in four Black tenants worried they wouldn't be able to pay rent in January.[10] Among other contributing factors, Black tenants are more likely to have lost jobs or to be hospitalized with COVID-19 than others.

31.     Unlike other states, South Carolina did not impose a lasting eviction moratorium in response to COVID-19. At the start of the pandemic, South Carolina's Supreme Court put in place a limited moratorium that expired on May 15, 2020. The South Carolina NAACP and other advocacy and legal services organizations requested an extension, but the South Carolina Supreme Court declined to take any further action.

32.     Federal interventions, like the federal eviction moratorium and rental assistance, have provided some support to tenants facing eviction. But these interventions have reached tenants facing eviction unevenly—or sometimes not at all.

33.     For example, many tenants, and especially Black tenants, did not know about the eviction moratorium and so were unable to submit the requisite paperwork to trigger its application.

---

[8] *See* Pam Fessler, *For Black Families, Evictions Are Still at a Crisis Point – Despite Moratorium*, NPR (Feb. 24, 2021), https://www.npr.org/2021/02/24/970190910/for-black-families-evictions-are-still-at-a-crisis-point-despite-moratorium.

[9] Hepburn et al., *supra* note 3, at 656.

[10] Brook LePage & Sarah Javaid, *Black, non-Hispanic Women and Latinas Use Advance Child Tax Credit to Cover Necessities and Pay Down Debt in the Last Month of Payments*, Nat. Women's L. Ctr. (Jan. 2022), https://nwlc.org/wp-content/uploads/2022/01/PulseWeek40FS-1.pdf.

34.     Many tenants have also been unable to access the federal rental assistance administered by South Carolina and certain counties in South Carolina. Some tenants did not know about the existence of this assistance. Others have had trouble completing the paperwork required to apply for the assistance. And some have been blocked because of administrative inefficiencies or mistakes.

35.     The consequences of evictions are severe for tenants, their families, and the communities in which they live. Evictions reproduce poverty and inequality, resulting in homelessness, negative health and educational outcomes, and long-lasting barriers to obtaining and maintaining stable housing.

**B.     South Carolina's Public Index**

36.     South Carolina's Public Index is a collection of publicly accessible websites that provide information about South Carolina state court cases.

37.     The Public Index contains public docket entries for eviction filings, which provide basic information about each tenant facing eviction, including the tenant's name and address.

38.     In order to access the Public Index, users go to https://www.sccourts.org/caseSearch/ and select a particular county to search. Before proceeding any further, users must indicate that they accept the Public Index's terms of service.

39.     The terms of service state:

> "Access to the South Carolina Judicial Department Public Index web sites by a site data scraper or any similar software intended to discover and extract data from a website through automated, repetitive querying for the purpose of collecting such data is expressly prohibited."

40.     If users click "Accept," indicating agreement to the terms of service, then they are directed to a case search page, as shown below:



41.     After they enter search criteria, the Public Index returns a table of relevant cases, including the name, party type, case number, filed date, case status, disposition date, case type, subtype, judgment number, and court agency for each case. Clicking on the case allows users to see additional information, including defendants' names and addresses.

42.     The Public Index websites for all counties except Greenville and Charleston employ technical limitations on scraping. These technical measures block access to the Public Index when automated activity is detected. In some cases, these technical measures also block users who run multiple manual queries.

43.     The Public Index websites for Greenville and Charleston have not implemented technical limitations on scraping.

44.     The Public Index websites for Greenville and Charleston remain fully functional.

45.     The South Carolina Supreme Court is responsible for "mak[ing] rules governing the administration of all the courts of the State." S.C. Const. art. 5, § 4. The Supreme Court created South Carolina's e-filing system and, with it, the Public Index to allow "the public to access case information and to view and print court documents." *Order Re: South Carolina Electronic Filing Policies and Guidelines; Pilot Version-Common Pleas*, No. 2015-001532 (S.C. 2015); *see also Statewide Court Case Management System Goes Live in Greenville County Today*, S.C. Jud Branch,

https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=189.

46.    The Chief Justice of the Supreme Court, as the administrative head of the judicial system, appoints an administrator of the courts and sets the terms of South Carolina courts. S.C. Const. art. 5, § 4.

47.    The Supreme Court has jurisdiction to discipline any member of the South Carolina bar who violates the terms of service of the Public Index. S.C. Const. art. 5, § 4.

### C.    South Carolina NAACP's Housing Navigator Program and Housing Advocacy Efforts

48.    To provide support to families lacking housing security and address South Carolina's eviction crisis, the South Carolina NAACP, alongside its Columbia Branch and the NAACP, launched the Housing Navigator Program in February of 2021.

49.    The Housing Navigator Program is a free program that serves as a coordinated access point for individuals and families experiencing housing instability or homelessness. Trained navigator volunteers assess individual tenant needs and connect tenants to vital legal and social resources, such as pro-bono eviction lawyers, rental and utility assistance, and child-care services.

50.    For example, Navigators are trained to provide tenants with information—but not legal advice—about how to request a hearing on an eviction action.

51.    One of the crucial goals of the Housing Navigator Program is to identify tenants *prior* to eviction. Preventing an eviction keeps people in their homes. And, once an individual or family is evicted, there are fewer resources available to provide stable housing.

52.    Since its creation, the Housing Navigator Program has helped hundreds of individual tenants access the legal, financial, and social resources necessary to respond to and prevent an eviction or find new housing.

53.    The Housing Navigator Program primarily focuses on tenants in Richland County, but volunteers with the program aid and support individuals facing eviction across the state.

54.     Building off of the Housing Navigator Program, the South Carolina NAACP has also helped launch rental assistance clinics around South Carolina. These clinics have helped hundreds of tenants apply for rental assistance to avoid eviction.

55.     Additionally, the South Carolina NAACP uses all forms of advocacy to promote access to affordable housing and prevent discriminatory housing actions. For example, through the Housing Navigator Program, the South Carolina NAACP has sent letters to landlords it believes are taking discriminatory eviction actions. And it has joined coalition efforts to promote statewide eviction diversion programs and eviction prevention actions.

**D.     Plaintiff's Desired Activities and Court Administration's Response**

56.     Although the South Carolina NAACP has been effective in preventing some evictions, it needs to gather already public information from the Public Index in bulk to expand its outreach and advocacy to help prevent unnecessary or discriminatory evictions.

57.     To help families facing eviction stay in their homes, the South Carolina NAACP needs to contact tenants who have had an eviction action filed against them. If these tenants do not understand the eviction process, or do not know where to turn for help, then they will be evicted without having a chance to exercise their right to have a hearing to defend themselves.

58.     The South Carolina NAACP is ready to have volunteers in its Housing Navigator Program and its members across the state reach out directly to these tenants to provide them with information about requesting a hearing and referrals to legal and nonlegal services that can help prevent an eviction.

59.     This outreach is time sensitive—as noted, tenants have only ten days from the filing of an eviction action to request a hearing on that action.

60.     To reach these tenants before they are automatically evicted, the South Carolina NAACP must be able to gather and record the names and addresses of tenants who have had an eviction action filed against them as soon as those records are available in the Public Index. The only way currently to gather this information quickly enough and at scale is by scraping new

eviction filings in the Public Index and recording the scraped information in an organized manner.

61.    The South Carolina NAACP also prevents unnecessary or discriminatory evictions through high-impact, systemic advocacy. At present, the South Carolina NAACP receives complaints about housing discrimination—for example, that landlords may be evicting tenants in a discriminatory fashion—and advocates on behalf of tenants to redress those complaints.

62.    In order to better identify unlawful practices and to make its advocacy more effective, the South Carolina NAACP needs to gather data about eviction filings in South Carolina. Doing so will allow the South Carolina NAACP to spot trends and patterns in eviction filings, which help identify discriminatory eviction practices that can be addressed through advocacy or Fair Housing Act litigation. More generally, the information gleaned from these trends also helps inform local and statewide advocacy directed at preventing evictions.

63.    The only way currently to gather enough eviction filings to create usable data for this advocacy is by scraping the Public Index to record the names and addresses of tenants who have faced eviction actions.

64.    The South Carolina NAACP has applied for and received grant funding specifically to use scraping to conduct this outreach to and advocacy on behalf of tenants facing eviction.

65.    The South Carolina NAACP's scraping of the Public Index would not impose any burden, or at most a *de minimis* burden, on the operation or functionality of the Public Index.

66.    But Court Administration's prohibitions on scraping the Public Index block the South Carolina NAACP's efforts.

67.    Because of these prohibitions, the South Carolina NAACP repeatedly reached out to Court Administration to see if Court Administration would consider solutions that would allow the South Carolina NAACP to gather eviction filings exclusively for its outreach and advocacy purposes.

68.    In January 2021, two weeks before the Housing Navigator Program launched, a coalition partner of the South Carolina NAACP wrote to Court Administration on behalf of the South Carolina NAACP to see whether Court Administration would provide regular updates on eviction filings, so that the South Carolina NAACP could conduct outreach to tenants in Richland County who had an eviction action filed against them.

69.    A representative from Court Administration wrote back that providing "weekly or even monthly updates would interfere with normal Judicial Branch operations" and stated that the Housing Navigator Program should be able to get the information it needed directly from the Public Index.

70.    Over the summer of 2021, the South Carolina NAACP again contacted Court Administration about accessing and recording the data it needed for its outreach and advocacy.

71.    In August 2021, the South Carolina NAACP sent Court Administration a letter noting the Housing Navigator Program's intention to scrape Public Index data. As the South Carolina NAACP explained, doing so would allow the Housing Navigator Program "to provide tenants with critical information at a crucial moment and, over time, bolster systemic research and advocacy efforts."

72.    At the end of August, a representative for the South Carolina NAACP spoke with a representative for Court Administration. During the call, the Court Administration representative stated that Court Administration would not allow the South Carolina NAACP to scrape the Public Index. The representative also reiterated that Court Administration would not consider providing regular updates on eviction filings, including pursuant to S.C. Rule 610, which governs "requests" for "bulk distribution of judicial records."

73.    After the call, South Carolina NAACP wrote again to Court Administration to confirm that it would not allow the Housing Navigator Program to scrape the records it needed or provide that information in a different manner.

74.    A representative from Court Administration wrote back noting that Court Administration was "not clear about the data" the Housing Navigator Program needed and

attached a form detailing the Rule 610 process.

75.    The South Carolina NAACP replied to note again the records it sought to gather through data scraping—already-public names and addresses—and to reiterate its understanding that Court Administration would not provide an alternative means of accessing these records. Court Administration never responded.

**E.    South Carolina NAACP's planned activities implicate the core concerns of the First Amendment, and are unreasonably burdened by Court Administration's categorical ban on scraping.**

76.    The South Carolina NAACP seeks to access and record civil eviction records in order to provide eviction assistance to individuals in need, ensure meaningful access to the courts, and advance its advocacy and reform efforts.

77.    Each activity is at the core of what the First Amendment protects: political speech that informs public debate, the right to petition the courts for redress of grievances and ensure access to the courts, and the ability of the public to monitor and serve as a check on the judicial process. *See*, *e.g.*, *N.A.A.C.P. v. Button*, 371 U.S. 415, 429 (1963) (the First Amendment protects advocacy efforts and litigation); *Bates v. State Bar of Arizona*, 433 U.S. 350, 376 n.32 (1977) ("[C]ollective activity undertaken to obtain meaningful access to the courts is protected under the First Amendment."); *In re Primus*, 436 U.S. 412 (1978) (nonprofit groups' solicitation for purposes of litigation is protected activity); *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 606 (1982) (First Amendment protects public access to judicial records).

78.    The First Amendment not only protects Plaintiff's described activities, it also protects Plaintiff's predicate gathering and recording of the information necessary to conduct those activities. *Globe Newspaper Co.*, 457 U.S. at 604 ("The First Amendment is thus broad enough to encompass those rights that . . . are nonetheless necessary to the enjoyment of other First Amendment rights."); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011) (first citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001)) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment.").

79. The protection for disseminating information is particularly strong with respect to information that constitutes public judicial records. *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 327–28 (4th Cir. 2021) (access to court records "improve[s] the quality of [the judicial] system by subjecting it to the cleansing effects of exposure and public accountability") (second alteration in original) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring)).

80. Court Administration's prohibition on scraping the Public Index constitutes an unreasonable burden on Plaintiff's First Amendment right to access, gather, and record the public information contained there.

81. The South Carolina NAACP cannot provide eviction services—like information about the 10-day response period—in a sufficiently prompt manner if it is forced to rely on manually searching the Public Index for filings.

82. The South Carolina NAACP cannot collect enough data through manual searches of the Public Index to adequately inform the public about systemic issues in eviction filings or discriminatory practices by landlords, as well as to expose the judicial system to meaningful review.

**F.    Court Administration's categorical ban on scraping unjustifiably impedes the South Carolina NAACP's right to access and record public court docket information under the First Amendment.**

83. The South Carolina NAACP has a well-established First Amendment right to access the information that it seeks.

84. Because the First Amendment "serves to ensure that the" public "can effectively participate in and contribute to our republican system of self-government," *Globe Newspaper Co.*, 457 U.S. at 604, the Supreme Court has long recognized a qualified right to access certain court records under the First Amendment. *See id.* ("Underlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment

was to protect the free discussion of governmental affairs.'") (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

85.    The First Amendment right of access extends to docket sheets in civil cases. *Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014).

86.    The State's prohibition on data scraping is also an unjustified limitation on Plaintiff's First Amendment right to record public information.

87.    Court Administration chose to create the Public Index, which makes certain court records available to the public for collection and review. Having granted access to the public at large, Court Administration cannot then impose unreasonable restrictions on people's ability to capture or record the information. *See, e.g., ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of making the recording is wholly unprotected . . . ."); *see also Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (prohibition on recording public meeting of an Alabama Supreme Court Advisory Committee implicated the First Amendment by "impact[ing] . . . how [Plaintiffs] were able to obtain access to and present information about the Committee").

88.    Court Administration's limitations on Plaintiff's ability to capture and record bulk data from the Public Index infringe on Plaintiff's ability to obtain records, reach and help individuals, and present information to the public and the courts about evictions in South Carolina.

89.    Court Administration's categorical prohibitions on scraping are unjustifiable and do not survive either strict or intermediate scrutiny under the First Amendment.

90.     Defendants' ban on scraping is not tailored at all. Nor is any "important interest" furthered by prohibiting automated searches of already-public records.

91.    For example, the prohibition on scraping contained in the website's "Terms of Service" only precludes attorneys who are admitted to practice law in South Carolina or their

agents from scraping the Public Index. For any other user, the Terms of Service appear entirely unenforceable. So the categorical ban on scraping the Public Index is arbitrary in its application.

92.     The technical measures prohibiting scraping are also not necessary to ensure the functioning of the Public Index. Two counties in South Carolina—Charleston and Greenville— do not impose technical prohibitions on scraping, and their websites are functional even though, on information and belief, entities outside South Carolina scrape those websites in violation of their terms of service.

93.     Additionally, many other court systems make their dockets available online without categorically barring scraping. The federal court system's Public Access to Court Electronic Records ("PACER") website, for example, allows scraping at certain hours.

94.     At minimum, Defendants' technical prohibitions on scraping are substantially broader than necessary to serve any legitimate government interest. The measures employed by Court Administration indiscriminately block anyone seeking to scrape the Public Index, regardless of the methods used and whether the impact on the Public Index's operations is *de minimis*, like the South Carolina NAACP's proposed scraping. In some cases, Court Administration's technical prohibitions even block users who attempt to manually run multiple queries on the Public Index, which inappropriately denies access to public records.

95.     There are far less restrictive means that Defendants could use to maintain site stability and protect against malicious actors without impeding responsible data gathering, such as imposing rate limits to limit the number of queries that can be sent to a specified user within a given timeframe, creating a bulk download option such that all information would be available with a single query, or allowing scraping during low-traffic times of day.

96.     Defendants' anti-scraping measures apply unevenly, lack tailoring, and restrict far more access than is necessary to ensure the integrity of the Public Index. In so doing, Defendants' prohibitions on scraping prevent the South Carolina NAACP from conducting its vitally necessary—and protected—activities.

## CAUSE OF ACTION

<u>First Cause of Action</u>
Violation of the First Amendment
42 U.S.C. § 1983

97.     Plaintiff incorporates by reference every allegation in the preceding paragraphs as if set forth fully here.

98.     The First Amendment, made applicable to the states by the Fourteenth Amendment, provides "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances."

99.     South Carolina Court Administration's prohibition on scraping, effected by the Public Index's terms of service and technical limitations, violates the First Amendment right to access and record publicly available information.

100.     The Public Index's categorical prohibition on scraping separately and together burden speech and expressive activity that is protected by the First Amendment, including speech that would contribute to public understanding of the South Carolina housing crisis and eviction patterns, and speech to petition the courts regarding South Carolina evictions issues.

101.     As applied to Plaintiff, Defendants' prohibition on scraping, through the Public Index's terms of service and technical limitations, unconstitutionally restricts Plaintiff's First Amendment-protected speech and expressive activities as described above. Plaintiff's scraping activities are done with the intent to serve the public interest and would impose a *de minimis* burden, if any, on the operation and functioning of the Public Index.

102.     Defendants' prohibition on scraping, through the Public Index's terms of service and technical limitations, is not narrowly tailored to any legitimate, important, compelling, or overriding government interest. Court Administration would benefit from Plaintiff's proposed scraping activities because the scraping will result in better understanding of South Carolina's housing crisis and increased services to South Carolinians facing eviction.

103.     Defendants, acting in their official capacities as Director of Court Administration and Administrative Head of the Judicial Branch, are violating the First Amendment by

prohibiting the South Carolina NAACP from scraping the Public Index. Defendants will continue to deprive the South Carolina NAACP of its First Amendment rights in the future if Defendants do not remove the prohibitions on scraping.

104.    The South Carolina NAACP is entitled to declaratory relief in the form of this Court ruling that prohibiting the South Carolina NAACP from scraping the Public Index is unconstitutional.

105.    The South Carolina NAACP is entitled to injunctive relief in the form of this Court enjoining Defendants from enforcing the categorical prohibition on scraping the Public Index, through its current technical measures or terms of service, against Plaintiff.

106.    The South Carolina NAACP is entitled to costs and attorneys' fees under 42 U.S.C. § 1988 on this claim for relief.

## REQUEST FOR RELIEF

The South Carolina NAACP respectfully requests an order and judgment:

1.    Declaring that Plaintiff South Carolina NAACP has a protected right under the First Amendment to the United States Constitution to scrape docket information from the Public Index;

2.    Declaring that the terms of service that govern the Public Index violate the First Amendment to the United States Constitution;

3.    Declaring that the current technical measures employed by Court Administration, which indiscriminately and categorically prohibit all scraping activity, violate the First Amendment to the United States Constitution;

4.    Permanently enjoining Defendants—including their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction—from enforcing a categorical prohibition on scraping the Public Index, through the current technical measures or terms of service, against Plaintiff;

5.    Awarding the South Carolina NAACP reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

6.    Granting the South Carolina NAACP such other relief as the Court deems just and proper.

Dated: March 30, 2022

Respectfully submitted,

*D. Allen Chaney Jr.*

Allen Chaney                              Joseph Schottenfeld*
Fed. Id. 13181                            Martina Tiku*
ACLU of South Carolina                    NAACP
P.O. Box 1668                             Office of General Counsel
Columbia, SC 29202                        4805 Mt. Hope Drive
(843) 282-5973                            Baltimore, MD 21215
achaney@aclusc.org                        jschottenfeld@naacpnet.org
                                          mtiku@naacpnet.org

Esha Bhandari*
Sandra S. Park*
Laura Moraff*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
(212) 549-2500
ebhandari@aclu.org
spark@aclu.org
lmoraff@aclu.org

*Application for admission *pro hac vice* pending

*Attorneys for Plaintiff*