**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, | C/A No.: 3:22-cv-01007-MGL |
| Plaintiff, | |
| v. | |
| TONNYA K. KOHN, in her official capacity as South Carolina State Court Administrator; | **MOTION TO DISMISS** |
| DONALD W. BEATTY, in his official capacity as Chief Justice of the South Carolina Supreme Court, | |
| Defendants. | |

The Defendants, Tonnya K. Kohn, in her official capacity as South Carolina State Court Administrator, and Donald W. Beatty, in his official capacity as Chief Justice of the South Carolina Supreme Court, by and through their undersigned counsel, hereby respectfully move for an Order, pursuant to Rule 12, Fed. R. Civ. P., and other authorities cited herein, dismissing this action in its entirety.

## FACTUAL BACKGROUND

In South Carolina, the authority for making rules governing the administration of the courts of the State has been granted to the South Carolina Supreme Court. *See* Complaint, ECF No. 1, ¶ 45. *See also* S.C. Const. art. 5, § 4. The Chief Justice of the South Carolina Supreme Court has been designated the administrative head of South Carolina's Judicial System. *See* Complaint, ¶ 46. *See also* S.C. Const. art. 5, § 4. To assist the Chief Justice in administering South Carolina's Judicial System, he is empowered to appoint an administrator and such assistants as he deems

necessary. *See id.* The Chief Justice's administrative arm, which is headed by Defendant Tonnya K. Kohn, is known as the Office of Court Administration. *See generally* https://www.sccourts.org/OverviewofSCJudicialSystem.cfm. The Office of Court Administration, Defendant Kohn, Defendant Beatty, and the South Carolina Supreme Court will be referred to collectively as the "South Carolina Judicial Branch" or the "Judicial Branch."

As part of administering the South Carolina Judicial System, the Judicial Branch has elected to create the Public Index, which "is a collection of publicly accessible websites that provide information about South Carolina state court cases." Complaint, ¶ 36. The Public Index provides public, electronic, and remote access to court filings including, as relevant here, "public docket entries for eviction filings, which provide basic information about each tenant facing eviction, including the tenant's name and address." *Id.*, ¶ 37. A user of the Public Index is able to search court records, by county, and the search will return information on "relevant cases, including the name, party type, case number, filed date, case status, disposition date, case type, subtype, judgment number, and court agency for each case." *Id.*, ¶¶ 38-41. Although not alleged in the Complaint, the Public Index also provides public, electronic, and remote access to pleadings, motions, orders, and all other unsealed documents filed in certain civil cases in the Court of Common Pleas. *See generally* https://www.sccourts.org/caseSearch/.

Plaintiff seeks to use this publicly-available information to pursue or accomplish several related goals via its recently-created Housing Navigator program. *See generally* Complaint, ¶¶ 48-55. In particular, Plaintiff intends to use the publicly-available data to pursue "high-impact, systemic advocacy," *id.*, ¶ 61, by analyzing the data in order to "spot trends and patterns in eviction filings," *id.*, ¶ 62, and to better "inform local and statewide advocacy directed at preventing evictions," *id.* For ease of reference, this intent or goal will be referred to as the "Advocacy Goal."

In addition to the Advocacy Goal, Plaintiff also intends to use the data to help interrupt the eviction process by providing information and offering resources to potential evictees. *See generally* Complaint, ¶¶ 56-60. Plaintiff asserts that this interest is time sensitive as evictees only have 10 days after an eviction action is filed to request a hearing. *Id.*, ¶ 59. For ease of reference, this intent or goal will be referred to as the "Outreach Goal."

The crux of this case is the allegation that technical limitations on "scraping," which is an automated form of data-gathering, put in place by the Judicial Branch inhibit Plaintiff in the pursuit of its Advocacy Goal and Outreach Goal. As to Plaintiff's Advocacy Goal, the Complaint makes no allegation that access to such information is time sensitive. The Complaint acknowledges the existence of a court rule that provides a process by which a person or entity may seek and receive "bulk distribution of or compiled information from judicial records." Rule 610, South Carolina Appellate Court Rules ("SCACR"). *See also* Complaint, ¶¶ 72-75. Yet, the Complaint does not allege that Plaintiff actually submitted a request pursuant to Rule 610 or that it was denied any information in response to such request. *See id.*, ¶¶ 74-75. As to the Outreach Goal, Plaintiff confirms repeatedly that it is able to search, access, and record the information it seeks—names and addresses for potential evictees—albeit in a manner it views as less efficient. *See* Complaint, ¶¶ 41, 56, 81. Lastly, the Complaint makes no allegation that the Judicial Branch has attempted to place any limit on what Plaintiff may do with the information once it has been gathered.

Based on these allegations, the Complaint asserts a single cause of action under the First Amendment pursuant to 42 U.S.C. § 1983 seeking both declaratory and injunctive relief. In particular, Plaintiff seeks a declaration that a First Amendment right exists to scrape data in Defendants' control, that the terms of service prohibiting scraping violate the First Amendment, and that the prohibition on scraping violates the First Amendment. Complaint, p. 19, ¶¶ 1, 2, 3.

The Complaint further seeks an injunction permanently enjoining Defendants from enforcing the ban on scraping against the Plaintiff "through the current technical measures or terms of service . . .." *Id.*, ¶ 4.

<h1 style="text-align:center">DISCUSSION</h1>

Defendants submit that this action should be dismissed in proper consideration of the important policies underlying the various formulations of the doctrine of abstention because this case implicates decisions for which the common law and the state constitution have entrusted authority to the Judicial Branch, and this authority has actually and thoroughly been exercised by that body to arrive at the current state of affairs. Respectfully, this Court should decline the invitation to substitute either its judgment or Plaintiff's judgment for the Judicial Branch's.

Even if this Court were inclined to find that abstention is inappropriate and instead accept Plaintiff's invitation to consider exerting supervisory authority over the Judicial Branch's policymaking decisions in the control of its own systems and data, Plaintiff has failed to allege facts sufficient to show any entitlement to relief. This is true for several distinct reasons. First, Plaintiff has no right to access data in the Judicial Branch's control. Second, even assuming such data may be considered a court record, the First Amendment requires no right of access. Third, even if such a right of access exists, it is not unlimited and does not extend to the particular type of access sought by Plaintiff. Lastly, and although this Court need not reach the question because no such right exists, any minor hurdle to one particular user posed by the prohibition on scraping does not offend the First Amendment.

### I. Abstention

While federal courts have a "duty to exercise the jurisdiction that is conferred upon them by Congress," the Supreme Court has cautioned that this duty is not absolute. *Quackenbush v.*

*Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (citing *Canada Malting Co. v. Paterson S.S., Ltd.*, 285 U.S. 413, 422 (1932) ("[T]he proposition that a court having jurisdiction must exercise it, is not universally true")). Rather, "federal courts may decline to exercise their jurisdiction . . . where denying a federal forum would clearly serve an important countervailing interest." *Id.* Those countervailing interests include "the basic principles of equity, comity, and federalism." *Courthouse News Service v. Brown*, 908 F.3d 1063, 1070 (7th Cir. 2018). Therefore, "[e]ven though abstention is the exception, not the rule, a federal court may, and often must, decline to exercise its jurisdiction where doing so would intrude upon the independence of the state courts." *Id.* at 1070-71 (internal citations omitted). At issue in the present case is a challenge to almost twenty (20) years of the South Carolina Judicial Branch's policy decisions regarding the administration of the courts and associated information in South Carolina.

As mentioned, in South Carolina, the authority for making rules governing the administration of the courts of the State has been granted to the South Carolina Supreme Court. The Chief Justice of the South Carolina Supreme Court has been designated the administrative head of South Carolina's Judicial System, and he carries out this function through the Office of Court Administration. As outlined above, the present case involves a request for the District Court, sitting as a court of equity, to review two interrelated frameworks concerning South Carolina court information adopted and administered by the Judicial Branch pursuant to this constitutional grant of authority. As a fundamental matter, "[e]very court has supervisory power over its own records and files." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). Exercising this authority— and in an effort to promote the "general right to inspect and copy public records and documents" *id.* at 597—the South Carolina Supreme Court created the trial court Case Management System ("CMS"), the online Public Index, and adopted Rule 610, SCACR. Although a different system,

the Supreme Court has also created a system for the electronic filing of documents in some courts by lawyers. *See* Section 1(b), South Carolina Electronic Filing Policies and Guidelines ("SCEF") ("'Case Management System Public Index' is the automated system that allows members of the public to access case information and to view and print court documents via the internet through each county's webpage."). These frameworks are relevant to the Plaintiff's present challenge.

The CMS was implemented by the Judicial Branch to permit court personnel to record case information, and the South Carolina Case Management System Online Public Index ("Public Index"), was developed to permit the public to "access case information and to view and print court documents via the internet through each county's webpage." Section 1(b), SCEF. *See also* Affidavit of Joel Hilke, ⁋ 2 ("Hilke Aff."), filed as an exhibit hereto.[1] The Public Index was implemented "so that lawyers, litigants, and members of the public may access certain case-related information without having to physically visit or call a courthouse over the phone[.]"). Therefore, the Public Index, by design, increased the public availability of information pertaining to civil cases. *Id.*, ¶ 4 ("Before the online Public Index became available, this information was not available [electronically] to the public; was only available to the public by visiting a county courthouse and using a public computer terminal, depending on the county's capabilities; or it did not exist.").

The CMS and the Public Index are not static systems adopted by Order of the South Carolina Supreme Court. Instead, as pertinent to this matter, the Publix Index is also a functioning

---

[1] This affidavit is being submitted in support of Defendants' arguments concerning abstention, which implicate Rule 12(b)(1), Fed. R. Civ. P., and are therefore properly supported by affidavit. Although Defendants submit that such consideration is not required in order to dispose of the claims in the context of Rule 12(b)(6), in the event that the Court finds any of the facts in the affidavit necessary to consider relative to the additional discussion in Section II concerning the merits of the questions at issue, the Court may consider such facts pursuant to Rule 12(d), Fed. R. Civ. P.

database system hosted by the Judicial Branch and utilized in coordination with the circuit and magistrate courts of the state. *See* Hilke Aff., ⁋ 3. Decisions regarding the operation of the Public Index have been evaluated and made by the Judicial Branch after balancing various circumstances, facts, and policies, including the purpose, security, and technical capabilities of the Publix Index. *Id.*, ¶ 9 (describing the history of Public Index and attempts to address data mining—including scraping—based upon the practical effects on the database); *id.*, ⁋ 15 (The Judicial Branch has "implemented policies for the web servers hosting the Public Index that restrict or rate limit traffic that is likely data mining. [The Judicial Branch] currently ha[s] twelve policies in place, developed over time to apply as both general rate limits and to specific data mining behaviors."). These decisions, which have involved approval by the Chief Justice, *see id.*, ¶ 12, are ongoing and have adapted to changing technology and changing demands on the Public Index from around 2003 to the present. *See id.*, ⁋ 21 (describing the current project "to develop a modern, web-based replacement CMS").

Reflective of its oversight and ongoing administration of the CMS and its Public Index, the Judicial Branch is continually updating and amending the policies relating to online access, as well as updating and improving the systems themselves. *See* Hilke Aff., ⁋ 21 (describing a "comprehensive review" of the trial court CMS and soliciting proposals to replace the system). Further, pursuant to its administrative oversight, the Supreme Court is both cognizant of and seeks to address evolving demands on the Public Index, including attempts by other entities to compile bulk information through a variety of historical methods. Hilke Aff., ⁋ 10 ("[T]he Public Index [was] unusable by the general public during data mining and screen scraping incidents. Further judges and law enforcement accessing [CMS] were still affected by data mining and scraping."). Aware of the use of scraping to compile bulk data and the problems scraping presented to the

functioning of the Public Index, and in an effort to supply an alternate means of supplying bulk data and compiled information, the South Carolina Supreme Court promulgated Rule 610, SCACR, in 2015, "which, for the first time, permitted the Supreme Court to authorize the bulk distribution of, and compiled information from, court records such as those in the online Public Index." Hilke Aff., ⁋ 13. The Supreme Court continued to evaluate the process set forth in Rule 610 and, thereafter, amended Rule 610, SCACR, in 2017. Hilke Aff., ¶ 16.

In light of this extensive history, the relief Plaintiff seeks in this case effectively invites this Court to elevate Plaintiff's own judgment or goals in place of an almost twenty (20) year history of the Judicial Branch's policy decisions regarding the administration of the state's CMS, specifically including the prohibition on scraping data from the Public Index, as well its chosen alternative process for the bulk distribution of and compilation of information from court records pursuant to Rule 610, SCACR. This invitation squarely implicates concerns identified by courts, similarly invited to wade into troublesome waters, that doing so would undermine a "deeper principle of comity: the assumption that state courts are co-equal to the federal courts." *Courthouse News Service v. Brown*, 908 F.3d at 1074. "This principal of comity takes on special force when federal courts are asked to decide how *state courts* should conduct their business." *Id*. (emphasis added).

As explained by the Fourth Circuit in discussing abstention:

> At the heart of the parties' contentions in this case is the doctrine of abstention. Although that doctrine has many different forks and prongs, its central idea has always been one of simple comity. Notwithstanding the overlapping obligations of state and federal courts with regard to both state and federal law, the federal judiciary has always maintained some modicum of respect for state policies in areas of paramount state concern.

*Johnson v. Collins Entertaining Co., Inc.*, 199 F.3d 710, 719 (4th Cir. 1999) (internal citations omitted) (holding that federal court was required to abstain from exercising jurisdiction in

reviewing disputed question of South Carolina law regarding video poker). The present matter implicates many "different forks and prongs" of the doctrine of abstention as discussed below.

### A. Principles of Comity and Federalism

The Supreme Court has recognized time and again that federal courts may abstain from exercising jurisdiction in "exceptional circumstances" where denying a federal forum would serve the interests of federalism and comity. *Quackenbush*, 517 U.S. at 718. In one such case, the Seventh Circuit reviewed a First Amendment challenge to a clerk's office's procedure of withholding electronically filed complaints until "administrative processing was completed and they were officially accepted." *Brown*, 908 F.3d at 1066. Recognizing that the situation did not "map exactly on" one of the principal categories of abstention, the Seventh Circuit found that the relief sought "would also impose a significant limit on the state court and their clerk in managing the state courts' own affairs." *Id.* at 1073. Therefore, the Seventh Circuit instructed that it was appropriate for the federal court to "decline to exercise jurisdiction" out of a "proper respect for state function, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 1073 (quoting *SKS & Associates, Inc. v. Dart*, 617 F.3d 674, 676 (7th Cir. 2010) (affirming abstention in federal case seeking injunction directing state court case management)).

Unlike cases that have found abstention may not have been warranted, *e.g.*, *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 324 (4th Cir. 2021), the present matter is not a challenge to the purposeless practice of one or two clerks of court within South Carolina. Instead, the present action seeks declaratory and injunctive relief amounting to a supervisory review of policy decisions made by the South Carolina Supreme Court as implemented and administered by the

Judicial Branch over the past twenty years through the CMS, Public Index, and Rule 610, SCACR. Specifically, the Judicial Branch's policy decision to prohibit scraping and, conversely, its policy decision to authorize the bulk distribution of and compiled information from court records pursuant to Rule 610, SCACR, were both uniquely in furtherance of the Judicial Branch's inherent supervisory power over its own records and files. *Nixon, supra.*[2] Administration of the South Carolina courts is a core judicial function bestowed on the Judicial Branch by the South Carolina Constitution.

Consequently, this Court's review of the policy decisions made by the Judicial Branch would necessarily entangle a federal court in the operations and internal affairs of the Judicial Branch, matters to which both the common law and the state constitution entrust authority to the Judicial Branch. Such review would intrude upon the independence and authority of the South Carolina Judicial Branch, therefore implicating the three principals of equity, comity, and federalism underlying and requiring abstention in this matter pursuant to the analysis set forth in *Brown* and similar cases. *See Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (describing "a doctrine of abstention" as "appropriate to our federal system, whereby the federal courts exercising a wise discretion restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary") (internal quotation marks omitted). *See also Johnson v. Collins Entertaining Co., Inc.*, 199 F.3d 710, 719 (4th Cir. 1999) ("Basic abstention doctrine requires federal courts to avoid interference with a state's administration of its own affairs.").

---

[2] The South Carolina Supreme Court has set forth its position on public access to courts in a judicial capacity as well. *See Ex parte Cap. U-Drive-It, Inc.*, 630 S.E.2d 464, 469-70 (S.C. 2006).

### B. Burford Abstention

As discussed above, while the present matter does not fit neatly into just one of the "different forks and prongs" of the doctrine of abstention, it implicates many of them, including abstention in deference to complex state administrative procedures known as *Burford* abstention. *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). "Like other abstention doctrines, *Burford* abstention is not a rigid pigeonhole into which federal courts must try to fit cases. Rather, it reflects a complex of considerations designed to soften the tension inherent in a system that contemplates parallel judicial processes." *Johnson*, 199 F.3d at 728 (internal citations omitted). *See also, First Penn-Pacific Life Ins. Co. v. Evans*, 304 F.3d 345, 348 (4th Cir. 2002) (holding that the district court did not abuse its discretion in declining to exercise jurisdiction and noting that "[t]he Supreme Court's decisions do not provide a formulaic test for determining when dismissal under *Burford* is appropriate.").

"Nevertheless, the general concern that should inform a federal court's discretion is clear enough." *Evans*, 304 F.3d at 348. "Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interest in retaining jurisdiction over the dispute and the competing concern for the independence of state action, that the State's interests are paramount and that a dispute would best be adjudicated in the state forum." *Id.* (internal citation omitted) (quoting *Quackenbush*, 517 U.S at 728).

Applying the *Burford* abstention doctrine, the *Johnson* court found that "[a] variety of state actors ha[d] been involved in crafting and implementing the state regulatory scheme at issue" in that case. *Johnson*, 199 F.3d at 723. After a lengthy analysis of the background and regulatory authority at issue, the *Johnson* court reversed the district court, finding that the "exercise of federal equitable discretion in this case supplanted the legislative, administrative, and judicial process of

South Carolina and sought to arbitrate matters of state law and regulatory policy that are best left to resolution of state bodies." *Id.* at 719-20. "When the federal courts step uninvited into the shoes of state courts . . . there exists a needless risk of tension between the two systems." *Id.* at 725-26 (citing *Burford*, 319 U.S. at 334 ("sound respect for the independence of state action" may require abstention to avoid "needless federal conflict with [a] state policy")).

The relief sought by the Plaintiff in this case invites the federal court, under the guise of its equitable discretion, to elevate Plaintiff's policy judgment that scraping is desirable (at least as it relates to Plaintiff's goals) above that of the South Carolina Supreme Court's and seeks to have this federal court substitute its policy for administrative decisions made by the South Carolina Judicial Branch pursuant to a South Carolina Constitutional grant of authority. Plaintiff invites this Court to step into the shoes of the South Carolina Supreme Court and review its regulatory frameworks established and administered through its administration of the CMS and the Public Index and the adoption of Rule 610, SCACR, all despite the clear authority of each court to control its own records and files. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) ("Every court has supervisory power over its own records and files . . . ."). Therefore, "[b]asic abstention doctrine requires [this] federal court[ ] to avoid interference with [South Carolina]'s administration of its own affairs" and abstain from exercising jurisdiction in this matter. *Johnson*, 199 F.3d at 719. Specifically, *Burford* abstention "counsel[s] abstention especially where, as here, state actors are charged with resolving state law issues that intimately affect state regulation of a core state concern." *Id.* at 729. The cautioned "risk of federal-state tension" is "acute" in the present matter where the Plaintiff seeks to tie the hands of the current and future chief justices of South Carolina's highest court to which regulation of the courts of the State of South Carolina have been entrusted pursuant to the South Carolina Constitution. The administration of the CMS and the Public Index

is an intimately state concern for the South Carolina Judicial Branch, thus warranting abstention. *See id.* at 726 ("Legal constraints cannot yield even to the noblest of intentions, for judicial visions of the social good will differ from issue to issue and judge to judge, and will, if allowed to run unchecked, thwart the expression of the democratic will.").

### C. Pullman Abstention

The Supreme Court again recognized the "important considerations of policy in the administration of federal equity jurisdiction" in crafting what has become known as the *Pullman* abstention doctrine. *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). "*Pullman* abstention requires federal courts to abstain from deciding an unclear area of state law that raises constitutional issues because state court clarification might serve to avoid a federal constitutional ruling." *Nivens v. Gilchrist*, 444 F.3d 237, 245 (4th Cir. 2006). "For example, *Pullman* abstention is appropriate when a plaintiff brings a federal case that requires the federal court to interpret an unclear state law. Exercising *Pullman* abstention, the federal court then stays the proceeding (or certifies the question) and directs the plaintiff to first press his claim in state court." *Id.* at 246. "Therefore, *Pullman* exists in order to allow state courts to resolve complicated issues of state law." *Id.*

In the present matter, abstention pursuant to *Pullman* would therefore also be appropriate because a South Carolina court is best positioned to review and interpret the Judicial Branch's policy decisions, within the framework of the administration of the South Carolina courts, to prohibit scraping of the Public Index and, conversely, its policy decision to authorize the bulk distribution of and compiled information from court records pursuant to Rule 610, SCACR. "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies." *Pullman*, 312 U.S. at 500. Abstention would, therefore,

serve the public interest in this in this matter by avoiding needless friction regarding the discretionary review of state policies adopted by the South Carolina Supreme Court. *See Meredith v. Talbot Cnty*, 828 F.2d 228, 232 (4th Cir. 1987) ("The usual rule is to retain jurisdiction in *Pullman* situations, but to dismiss in *Burford* situations . . . [but] district courts may dismiss actions where abstention is justified on both *Pullman* and *Burford* grounds.").

## II. First Amendment

Even if the Court were to conclude that abstention is not called for in this case, Plaintiff's claim would still fail because it has no right to the information sought under the circumstances alleged.

### A. Right to Access Data or Information in the Government's Control

To reiterate, the data sought by Plaintiff in furtherance of its Outreach Goal is the names and addresses of persons against whom eviction actions are filed. This data is within the Judicial Branch's control by way of its input from the parties' pleadings into the CMS by the individual local courts in which eviction actions are filed, and its display on the Public Index system. *See generally* S.C. Code Ann. § 27-33-40 (providing that jurisdiction for landlord-tenant matters concurrently belongs to circuit courts and county courts). Plaintiff not only seeks access, which it already has, but it seeks unfettered and unrestricted access. Plaintiff further seeks access by its chosen method rather than by the bulk access procedure adopted in Rule 610.

As a starting point, there is simply no general right to information or data within the government's control, much less an unrestricted right like that alleged by Plaintiff. For instance, in the context of a dispute over a media entity's request to enter and inspect the conditions of a jail facility, the Supreme Court explained that it had "never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Houchins v. KQED,*

*Inc.*, 438 U.S. 1, 9 (1978). Like the Plaintiff has in this case, the media entity cited generally to cases relating to the importance of "informed public opinion and the traditional role of a free press as a source of information," in response to which the Court noted that neither general proposition "intimated that the Constitution *compels* the government to provide the media with information or access to it on demand." *Id.* (emphasis in original).

Nor did a generalized argument concerning an overall decrease or restriction in the flow of information convince the Court that access was mandated by the First Amendment. *See id.* at 12 ("There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.") (quoting *Zemel v. Rusk,* 381 U.S. 1, 16-17 (1965). *See also* Complaint, ¶ 56 ("Although the South Carolina NAACP has been effective in preventing some evictions, it needs to gather already public information from the Public Index in bulk to expand its outreach and advocacy . . . ."). The Court also drew a distinction that is important in this case—"[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Houchins*, 381 U.S. at 12 (quoting *Zemel*). Whatever Plaintiff's right to conduct activity in furtherance of its Advocacy or Outreach Goals, such right does not carry with it the unrestrained right to gather information or data.

The Court in *Houchins* was also troubled by the fact that the media entity's arguments invited the "Court to involve itself in what is clearly a legislative task which the Constitution has left to the political processes." 381 U.S. at 12. Just like the policies underlying cases concerning abstention discussed above, the Court felt that restrictions placed on access to a jail were questions

of policy "which a legislative body might appropriately resolve one way or the other." *Id.* The Court cautioned that it "must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment. To do so is to trivialize constitutional adjudication." *Id.* at 13. The Court further noted that the media entity had other ways of gathering information, "albeit not as conveniently as they might prefer." *Id.* at 15. Such is the case here. Plaintiff has alternate means of gathering the data it seeks—manual searches on the Public Index, review of the court records in the office of the clerk, and bulk data requests by way of Rule 610, SCACR. That those may not be the most convenient ways in the Plaintiff's estimation is of no constitutional significance.

In another case dealing with the question of the right of access to information or data in the government's control that aligns closely with the facts in the current case, the Supreme Court held that a California law regulating access to arrestees' addresses was simply a law regulating access to information in the hands of the government rather than a regulation on anyone's right to engage in speech. *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40 (1999). The law in question restricted access to arrestees' addresses to situations where the information would be used for "scholarly, journalistic, political, or governmental purpose" and prohibited access where the information would be used for a commercial purpose. *Id.* at 35. The Court held that the law was not subject to attack under the First Amendment because the law did not attempt to prohibit "a speaker from conveying information the speaker already possesses." *Id.* at 40. Rather, the law was simply a "governmental denial of access to information in its possession." *Id.* Importantly, the Court pointed out that California could have decided "not to give out arrestee information at all without violating the First Amendment." *Id.*

Justice Ginsburg went further in her concurring opinion, acknowledging that were California to provide unfettered access to "the names and addresses of arrestees for everyone to use freely, it would indeed be easier to speak to and about arrestees than it is under the present system." *Id.* at 43 (Ginsburg, J., concurring). However, "if States were required to choose between keeping proprietary information to themselves and making it available without limits, States might well choose the former option." *Id.* This is the decision that Plaintiff attempts to force on the Judicial Branch by way of the relief sought in this case—make the data available without limits so that Plaintiff may put the data to its own specific use. As the Court recognized in *United Reporting*, if the Judicial Branch has the choice not to make the data available in the first place, certainly it is not forced to accept Plaintiff's judgment that it should be permitted to scrape this data from the Public Index once it is made available.

It is worth noting again that there is no dispute that the information Plaintiff seeks *is* available to it, both on a case-by-case basis and, potentially, in bulk. Utilizing the Public Index, Plaintiff may access the information it seeks from anywhere that an internet connection is available, and may do so 24 hours a day every day of the year. This is the same level of access enjoyed by the general public. Plaintiff may also submit a request for bulk data or compiled information from court records pursuant to Rule 610, SCACR. Regardless of the fact that Plaintiff has specific goals in mind once the information is obtained, it is entitled to no greater access than any other member of the general public.[3]

---

[3] To the extent Plaintiff asserts that its own commendable goals entitle it to special access beyond that provided to the general public, such a holding would create obvious equal protection concerns for the Judicial Branch. *See, e.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike.").

## B. Right of Access to Court Records

The vast majority of information the Plaintiff seeks—names and address information of defendants in eviction actions, is data that is inputted in the CMS by court personnel from the actual court records themselves. Thus, the data at issue, in Defendants' view, is proprietary data in the government's control and does not constitute a "court record," and therefore Plaintiff has no right of access to it under *Houchins*, *United Reporting*, and similar cases. Even assuming for the sake of argument that such data is properly classified as a court record instead of proprietary data, Plaintiff would still not be entitled to access the data *by way of scraping* because the First Amendment does not secure such a right of access.

### i. Experience and Logic

Courts considering whether the First Amendment provides access to a particular court proceeding or record have used the "experience and logic test." Under this test, courts consider two questions: whether the particular record "has historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 326 (4th Cir. 2021) (internal alterations and quotation marks omitted). There can be no doubt that data compiled by the Judicial Branch or a similar body, in electronic format, has not "historically been open to the press and general public." Such a process and format has only begun to exist in the last 20 years or so, at least in South Carolina. Data analytics and similar technology or processes are even newer. Rather, the type of access that has been historically provided for the names of parties was case-by-case physical access of hard copy court records.[4]

---

[4] Defendants are aware of no case indicating that access to parties' addresses has been part of the historical access to court records in general. Indeed, the Supreme Court of South Carolina has restricted the inclusion of addresses of individuals in certain circumstances. *See* Rule 41.2(a)(4),

In a case with facts remarkably similar to the facts of the instant case, another district court analyzed the experience and logic test as it applied to a dispute concerning access to data compiled by the Los Angeles court system known as the Information Access Provider ("IAP") program. *Los Angeles Times v. Cnty. of Los Angeles*, 956 F. Supp. 1530, 1531 (C.D. Cal. 1996). The IAP program compiled data from the superior and municipal courts across L.A. County, including "case name and number, attorneys' names, hearing dates, and case disposition (judgment or dismissal)." *Id.* The compiled data was made available in two parts: "a ten year historical compilation and periodic updates of the same information." *Id.* While the ten-year historical compilations were made available to the general public, at cost, the periodic updates were available only to subscribers. *Id.* The plaintiffs in that case alleged that the IAP program data constituted "a court record to which they have a First Amendment right of access." *Id.* This was premised on the further assertion that the "IAP Program data compilation—in its electronic format—is a 'court record.'" In analyzing whether the First Amendment required the right of access alleged, the court used the "experience and logic" framework. *See id.* at 1538-40.

In addressing the experience prong of the test, the court noted "[b]y definition, there is no historical tradition of allowing public access to records like the IAP Program data in the format and manner sought by the plaintiffs. The on-line availability of such information is made possible by modern computer technology." *Id.* at 1540. The court also noted that the particular format in which the plaintiffs sought access to the information was not a format "relied upon or used by judges or court clerks in deciding or tracking cases." Plaintiff in this case similarly requests a particular type of access, scraping, that has not been historically available and is not now relied on

SCRCP (requiring that home addresses of minors, sexual assault or victims abuse and neglect, and non-parties be excluded or redacted).

by judges or clerks in conducting the affairs of their respective courts. The Public Index system created by the Judicial Branch far exceeds the level of access historically provided by making such information available electronically and remotely. Thus, the experience prong of the test indicates that the information at issue, in the context of the type of access sought by Plaintiff, is not subject to a right of access under the First Amendment.

As to the "logic" prong of the test, Plaintiff fares no better. The information sought by Plaintiff here is the names and addresses of defendants in eviction proceedings. This is not the type of information that has historically been a significant factor in the operation of judicial proceedings. The *Los Angeles Times* court noted that a general right to access was not the question. Rather, the question was whether the particular format and type of data requested "would promote public confidence in the judiciary; would ensure more accurate factfinding; or would give the public information about how the law is practically applied by Superior and Municipal court judges." *Id.* at 1540. The court found it significant that the particular compilation at issue was no more than "a summary description of case specific information" and that it did not contain "case files, pleadings, documents, court orders or opinions." Information concerning legal and factual contentions of the parties, content of documents submitted, and legal reasoning applied by the court in deciding motions or rendering judgments is the kind of information typically associated with structural usefulness to the evaluation of the court system. *See id.* Plaintiff here seeks no such substantive information. Importantly, the court also noted that even outside of the daily access to the IAP program data, "all of these methods and court records remain available to plaintiffs and members of the public." *Id.* Here, the information Plaintiff seeks likewise remains available to it— either by visiting courthouses, performing manual searches of the Public Index, or by requesting bulk data or compiled information from court records via Rule 610, SCACR. Accordingly, neither

prong of the experience and logic test supports Plaintiff's claimed right of access under the First Amendment.

### ii. Scope of Right

Even if a qualified right to access has attached based on the "experience and logic test," such a right is qualified and not unlimited. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9, (1986) ("These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a *qualified* First Amendment right of public access attaches. But even when a right of access attaches, *it is not absolute*.") (emphasis supplied).[5] As relevant here, any qualified right of access to the information in question is not so broad as to extend to electronic access, much less bulk or automated electronic access via scraping.

Numerous courts identifying rights, such as the right to access judicial records, in the abstract have nonetheless held that such rights are not unlimited. *See, e.g.*, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) ("It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."). This discussion seems to arise most frequently in cases concerning the contours of the right to access to criminal trials. For instance, in *Nixon*, the Supreme Court rejected the notion that the right of the public to access a criminal trial included the right to copy exhibits and materials displayed in open court. *Id.* at 608-09. Likewise, the Fourth Circuit has concluded that the general right under the First Amendment for the public to access "criminal trials, including access to

---

[5] This applies to civil cases as well as criminal cases. *See, e.g.*, *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018) ("Yet the press's right of access to [civil] court documents is not absolute—it is qualified.") (citing *Nixon*).

documents submitted in the course of such trials[,]" does not include a "right to physical access to an audio tape that was played in open court in a criminal trial, admitted into evidence, and for which [the plaintiff] possesses a complete verbatim transcript." *Fisher v. King*, 232 F.3d 391, 396 (4th Cir. 2000). *See also, e.g.*, *United States v. Edwards*, 785 F.2d 1293, 1296 (5th Cir. 1986) (holding that the constitutional right of access to criminal trials does not extend to include the right to broadcast such trials); *United States v. McDougal* 103 F.3d 651 (8th Cir. 1996) (concluding that the right of access to criminal trials or judicial records did not include the right to physical access to a videotape of former President Bill Clinton's testimony); *Rice v. Kempker*, 374 F.3d 675, 678 (8th Cir. 2004) (assuming without deciding that the right to open criminal trials extends to executions, but holding that such a right does not include the right to videotape the execution); *Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999) ("The First Amendment does not require states to accommodate every potential method of recording its proceedings, particularly where the public is granted alternative means of compiling a comprehensive record.").

While these cases are only indirectly applicable to the facts at issue in the instant case, they do amply demonstrate that an abstract right to access court records does not extend to every possible permutation of the exercise of that right or to every type of access necessary to satisfy every potential user. These cases also demonstrate that even if certain technological advances, like television, have become commonplace—not unlike what Plaintiff alleges as it pertains to scraping public websites, *see* Complaint, ¶¶ 92, 93—the government may still constitutionally decide to provide only certain types or degrees of access. *See also Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 24 (2d Cir. 1984) ("Instead, our point is that until the First Amendment expands to include television access to the courtroom as a protected interest, television coverage of federal

trials is a right created by consent of the judiciary, which has always had control over the courtrooms, a consent which the federal courts, including the Southern District of New York, have not given."). The same can be said for electronic access to court records. Just like television access to courtrooms, which has been given in some courtrooms and denied in others, the South Carolina Judicial Branch has exercised its authority and prerogative to make information relating to court cases electronically available. However, this has been done with the Judicial Branch's leave, which it has declined to expand to include unfettered bulk or automated electronic access via scraping or other means. Put simply, the fact that South Carolina has used technology to expand and simplify access should not then automatically raise the First Amendment bar to be used as a jumping off point for demands for greater access.

Like the cases relating to television coverage of criminal trials, the fact that the media may be able to more effectively (or more entertainingly) publish a story concerning a criminal trial if it is able to show video footage does not define the scope of the right to access criminal trials. Nor does Plaintiff's belief that it may more easily or effectively pursue its Outreach Goals if it were permitted to gather bulk data in an automated fashion define the scope of any right to access court records. Similarly, the scope of the right not defined by the importance of the subject matter or the stated goals. *See, e.g.*, *Garrett v. Estelle*, 556 F.2d 1274, 1279 (5th Cir. 1977) ("While we agree that the death penalty is a matter of wide public interest, we disagree that the protections of the first amendment depend upon the notoriety of an issue.").

In this case, the Judicial Branch has not prohibited access to court information, it has broadened it by establishing electronic access via the Public Index. This goes beyond the requirements of the right to access judicial records. It is undisputed that this expanded access is available to Plaintiff. The Judicial Branch has also promulgated a rule permitting access to bulk or

compiled information from court records. This process is also available to Plaintiff should it seek to pursue it.[6] Like electronic access, this access also goes beyond the requirements of the right to access judicial records. Because the Judicial Branch provides greater access than is required, Plaintiff's allegation that it does not go far enough fails to state a First Amendment claim.

### C. Level of Scrutiny

In order to reach this step of the analysis, this Court must be willing to stretch to conclude that the data at issue is not proprietary information. The Court must take the further leap to conclude that an abstract right to access judicial records includes not only a right to electronic access, but an unlimited right to automated and bulk electronic access. No court that Defendants are aware of has taken such a series of leaps. If the Court were nonetheless inclined to entertain such an analysis, it need not give more than passing scrutiny to the limitations on scraping complained of by Plaintiff.

This is true for several interrelated reasons. First, the technical limitation on scraping is content neutral, viewpoint neutral, and imposes no speaker-based or post-collection restrictions. *See Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (explaining that one element that may subject a regulation on information in the government's control to additional scrutiny is whether the regulation "imposes content- and speaker-based conditions on access to and use" of the information). Second, the data sought by Plaintiff is apolitical. *See id.* (an additional element that

---

[6] The fact that Plaintiff has not seen fit to pursue a Rule 610, SCACR, request for bulk or compiled information means any challenge to the effectiveness or any other elements of that process is not ripe for adjudication. *See, e.g.*, *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) ("A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative."). The Complaint acknowledges that, in response to a request for broader access to data, the Plaintiff was told that it was unclear what data was being sought and provided with a form detailing the Rule 610 process. *See* Complaint, ¶ 74. Plaintiff does not allege that it ever submitted such a request.

may subject a regulation to additional scrutiny is whether the information is "closely tied to political speech"). Third, the technical limitation on scraping affords no mechanism for selective enforcement (unless, that is, Plaintiff obtains the relief it requests). *See id.*

In addition to the absence of any elements warranting substantial scrutiny, Defendants again reiterate that the policies underlying the doctrine of abstention above make it unnecessary for the Court to wade into this dispute, at least not to the depth to which Plaintiff requests. At a minimum, the fact that the Judicial Branch has made policy decisions concerning the control and availability of its own information should be afforded substantial deference. *Fusaro,* 930 F.3d at 250 ("[T]he decision to make government information available to the public is generally a question of policy for the political branches.") (internal quotation marks omitted); *id.* at 252 ("And it is important that the [information sought] is a government record, so that regulations on its distribution reflect policy judgments to which courts must ordinarily defer."); *id.* at 256 ("And the judgment of the Maryland legislature regarding the release of government information is entitled to substantial deference, particularly where [the challenged regulation] is part of a complex scheme to regulate elections.").

Where the suspect factors identified in *Fusaro* are absent and the factors warranting deference are present, then the Judicial Branch's interest in regulating its own records and systems should be and is sufficient to withstand Plaintiff's attempted challenge.

{SPACE INTENTIONALLY LEFT BLANK}

## <u>Conclusion</u>

For the reasons set forth above, Defendants respectfully request that this Court dismiss this action in its entirety, whether under the doctrine of abstention or because Plaintiff has failed to allege a First Amendment claim.

Respectfully submitted,

CROWE LAFAVE, LLC

By:    *s/ Steven R. Spreeuwers*
        Robert D. Garfield, Fed. ID No. 7799
        Steven R. Spreeuwers, Fed. ID No. 11766
        2019 Park Street
        Columbia, South Carolina 29201
        T: (803) 999-1225
        F: (803) 848-8157
        robert@crowelafave.com
        steve@crowelafave.com

–and–

ROBINSON GRAY STEPP & LAFFITTE, LLC

By:    *s/ Rachel M. Hutchens*
        Rachel M. Hutchens (Fed. I.D. 12696)
        1310 Gadsden Street
        Post Office Box 11449
        Columbia, South Carolina 29211
        (803) 929-1400
        Email: rhutchens@robinsongray.com

–and–

LINDEMANN & DAVIS, P.A.

BY:    *s/ Andrew F. Lindemann*

Andrew F. Lindemann, Fed. ID No. 13030
Post Office Box 6923
Columbia, South Carolina 29260
T: 803-881-8920
Email: andrew@ldlawsc.com

*Counsel for Defendants*

July 8, 2022