## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

SOUTH CAROLINA STATE CONFERENCE OF
NAACP;

       *Plaintiff*,

   v.

TONYA KOHN; in her official capacity as South
Carolina State Court Administrator;

DONALD BEATTY, in his official capacity as
Chief Justice of the South Carolina Supreme
Court;

       *Defendants*.

Case No. 3:22-cv-1007-MGL

## **Plaintiff's Opposition to Defendants' Motion to Dismiss**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 2

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................... 4

I.    Abstention is inappropriate because this case presents an important and justiciable
      question of federal law. ........................................................................................ 4

      A.    Defendants' primary abstention argument is contrary to binding Fourth
            Circuit law. ................................................................................................. 5

      B.    The *Burford* doctrine—which "only rarely favors abstention"—does not
            justify abstention here. ............................................................................... 6

      C.    The *Pullman* doctrine does not apply because the case does not implicate a
            state law. ..................................................................................................... 8

II.   The South Carolina NAACP plausibly alleges that Defendants' categorical
      prohibition on scraping violates its First Amendment right to access and record
      public court records. ............................................................................................ 9

      A.    The First Amendment protects the South Carolina NAACP's right to
            access—including by scraping—the judicial records at issue in this case.
            ................................................................................................................... 10

      B.    The First Amendment right to record matters of public interest
            encompasses the right to scrape public court records. ............................. 20

      C.    Court Administration's categorical prohibition on scraping cannot satisfy
            First Amendment scrutiny. ........................................................................ 24

CONCLUSION ............................................................................................................... 30

CERTIFICATE OF SERVICE ....................................................................................... 32

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*ACLU of Ill. v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ................................................................. 21, 24, 30

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ..................................................................... 23, 24

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) ..................................................................... 20, 24

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) ............................................................................................. 8

*Bell v. Hood*,
    327 U.S. 678 (1946) ............................................................................................. 3

*Bellotti v. Baird*,
    428 U.S. 132 (1976) ............................................................................................. 7

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020) ....................................................................... 28, 29

*Burford v. Sun Oil Co.*,
    319 U.S. 315 (1943) ............................................................................... 4, 5, 6, 7

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ........................................................................................... 22

*Chestnut v. Wallace*,
    947 F.3d 1085 (8th Cir. 2020) ......................................................................... 21

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ........................................................................................... 23

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ......................................................................................... 4, 5

*Courthouse News Serv. v. Schaefer*,
    2 F.4th 318 (4th Cir. 2021) ...................................................................... passim

*Courthouse News Service v. Brown*,
    908 F.3d 1063 (7th Cir. 2018) ........................................................................... 4

*Courthouse News Serv. v. Planet*,
    947 F.3d 581 (9th Cir. 2020) ..................................................................... 15, 25

*Cox v. Planning Dist. I Cmty. Mental Health & Mental Retardation Servs. Bd.*,
    669 F.2d 940 (4th Cir. 1982) ............................................................................ 5

*Doe v. Pub. Citizen*,
    749 F.3d. 246 (4th Cir. 2014) ............................................................ 11, 12, 15, 16

*Dyer v. Smith*,
    2021 WL 694811 (E.D. Va. Feb. 23, 2021)........................................................ 21

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ............................................................................ 26

*England v. Louisiana St. Bd. of Med. Exam'rs*,
    375 U.S. 411 (1964)............................................................................................ 7

*Felmeister v. Office of Att'y Ethics*,
    856 F.2d 529 (3d Cir. 1988)................................................................................ 6

*Fields v. City of Philadelphia*,
    862 F.3d 353 (3d Cir. 2017).............................................................................. 23

*Fisher v. King*,
    232 F.3d 391 (4th Cir. 2000) .............................................................................. 6

*Fordyce v. City of Seattle*,
    55 F.3d 436 (9th Cir. 1995) .............................................................................. 21

*Garcia v. Montgomery Cty.*,
    145 F. Supp. 3d 492 (D. Md. 2015)............................................................. 21, 23

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011)......................................................................... 20, 23

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*,
    457 U.S. 596 (1982)............................................................................. 11, 17, 24

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
    721 F.3d 264 (4th Cir. 2013) ............................................................................ 26

*Griswold v. Connecticut*,
    381 U.S. 479 (1965 ........................................................................................... 23

*Hartford Courant Co. v. Pellegrino*,
    380 F.3d 83 (2d Cir. 2004)......................................................................... passim

*In re Providence J. Co., Inc.*,
    293 F.3d 1 (1st Cir. 2002)................................................................................. 26

*Johnson v. Collins Entm't Co., Inc.*,
   199 F.3d 710 (4th Cir. 1999) ............................................................................ 6

*Kerns v. United States*,
   585 F.3d 187 (4th Cir. 2009) ............................................................................ 3

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ............................................................... 25, 27

*Los Angeles Times v. County of Los Angeles*,
   956 F. Supp. 1530 (C.D. Cal. 1996) ............................................................ 15, 16

*M.C. Through Chudley v. Shawnee Mission Unified Sch. Dist. No. 512*,
   363 F. Supp. 3d 1182 (D. Kan. 2019) ........................................................... 20

*Martin v. Stewart*,
   499 F.3d 360 (4th Cir. 2007) ............................................................................ 4

*McCullen v. Coakley*,
   573 U.S. 464 (2014)........................................................................................ 28

*Mills v. Alabama, 384 U.S. 214, 218 (1966)*................................................... 21

*Multimedia Pub. Co. v. Greenville-Spartanburg Airport Dist.*,
   991 F.2d 154 (4th Cir. 1993) ......................................................................... 29

*Nat'l Ass'n of Gov't Emps. v. Mulligan*,
   849 F. Supp. 2d 167 (D. Mass. 2012) ............................................................ 6

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018)................................................................................... 29

*NC RSOL v. Boone*,
   402 F. Supp. 3d 240 (M.D.N.C. 2019) .......................................................... 7

*Neufeld v. City of Baltimore*,
   964 F.2d 347 (4th Cir. 1992) ........................................................................... 7

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
   491 U.S. 350 (1989)..................................................................................... 5, 6

*Nivens v. Gilchrist*,
   444 F.3d 237 (4th Cir. 2006) ........................................................................... 7

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978)........................................................................... 16, 17, 18

*Pomponio v. Fauquier Cnty. Bd. of Sup'rs*,
   21 F.3d 1319 (4th Cir. 1994) ........................................................................... 6

*Press-Enterprise Co. v. Superior Ct.*,
   478 U.S. 1 (1986) ............................................................................................ 14, 25

*Proj. Veritas Action Fund v. Rollins*,
   982 F.3d 813 (1st Cir. 2020) ................................................................................ 27

*Quackenbush v. Allstate Ins. Co.*,
   517 U.S. 706 (1996) ............................................................................................... 5

*R.R. Comm. of Tex. v. Pullman*,
   312 U.S. 496 (1941) ....................................................................................... 4, 7, 8

*Republican Party of N.C. v. Martin*,
   980 F.2d 943 (4th Cir. 1992) .................................................................................. 3

*Revene v. Charles Cnty. Comm'rs*,
   882 F.2d 870 (4th Cir. 1989) ................................................................................ 25

*Reynolds v. Middleton*,
   779 F.3d 222 (4th Cir. 2015) ................................................................................ 28

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) ............................................................................................. 12

*Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*,
   4 F.3d 244 (4th Cir. 1993) ................................................................................ 3, 25

*Rideout v. Gardner*,
   838 F.3d 65 (1st Cir. 2016) .................................................................................. 26

*Rushford v. New Yorker Mag., Inc.*,
   846 F.2d 249 (4th Cir. 1988) ................................................................................ 24

*Sandvig v. Sessions*,
   315 F. Supp. 3d 1 (D.D.C. 2018) .......................................................................... 22

*Smith v. City of Cumming*,
   212 F.3d 1332 (11th Cir. 2000) ............................................................................ 21

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ............................................................................................. 21

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................................................................. 20

*Stone v. Univ. of Md. Med. Sys. Corp.*,
   855 F.2d 178 (4th Cir. 1988) ................................................................................ 10

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994), *cert. denied,* 142 S. Ct. 560 (2021) ..................................................... 27

*United States v. Antar,*
    38 F.3d 1348 (3d Cir. 1994)................................................................................ 14, 17, 19

*Vt. Right to Life Comm., Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000)................................................................................................ 4

*W. Watersheds Proj. v. Michael,*
    869 F.3d 1189 (10th Cir. 2017) ....................................................................................... 20

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)...................................................................................................... 8, 25

*Westmoreland v. Columbia Broad. Sys., Inc.,*
    752 F.2d 16 (2d Cir. 1984)................................................................................................ 16

*Whiteland Woods, L.P. v. Township of West Whiteland,*
    193 F.3d 177 (3d Cir. 1999)............................................................................................. 18

*Zwickler v. Koota,*
    389 U.S. 241 (1967) ........................................................................................................... 4

## Bills & Statutes

S.C. Code § 27-37-40........................................................................................... 2, 13, 16

## Rules

Fed. R. Civ. P. 12(b)(1)........................................................................................................ 3

Fed. R. Civ. P. 12(b)(6)...................................................................................................... 26

Fed. R. Civ. P. 12(d) .......................................................................................................... 26

Fed. R. Civ. P. 56 .............................................................................................................. 26

## INTRODUCTION

In this case, Plaintiff South Carolina State Conference of the NAACP (the "South Carolina NAACP") challenges the South Carolina Court Administration's categorical prohibition against scraping the information contained in the electronic docket sheets of the Public Index, the county-by-county repository of legal filings in South Carolina. Anyone with an Internet connection can access the Public Index and manually search for information about eviction proceedings. But Court Administration has imposed a blanket ban on scraping public information contained within the Public Index. The ban meaningfully prevents the South Carolina NAACP from accessing the docket sheets and gathering the information it needs to identify trends in eviction proceedings, help tenants achieve meaningful access to the courts, and fight evictions. The ban burdens Plaintiff's First Amendment right to access, record, and disseminate information, without serving any valid or sufficient governmental interest.

Defendants do not dispute that the South Carolina NAACP is allowed to manually access and retrieve the records they seek from the Public Index, but insist that retrieving the same information through scraping is untenable. There is no justification for that distinction. Whether the South Carolina NAACP conducts 500 manual searches or 500 automated searches spread throughout the day, the load inflicted on the Public Index is the same. To allow one and categorically prohibit the other cannot survive any form of scrutiny.

Neither of Defendants' two grounds for dismissal has merit in this case. First, this Court should not abstain from deciding this case based on general abstention principles. Abstention is appropriate only where "a case falls into one . . . specific [abstention] doctrine[]," *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 324 (4th Cir. 2021) (cleaned up), and, as Defendants recognize, this case does not. Defendants' Motion to Dismiss, ECF No. 12, at 11. Even if it did, none of the underlying reasoning behind any of the various abstention doctrines counsels in favor of abstaining here.

Second, Defendants' argument that there is no right to access information in the government's control is similarly unavailing here. The South Carolina NAACP has both a First Amendment right to access the judicial records in the Public Index—the public electronic docket sheets—and a First Amendment right to record that information, because Court Administration put all of the information the South Carolina NAACP seeks into the public's possession. The First Amendment does not tolerate restrictions on access or use of public information absent an overriding government interest, which Defendants do not have here. Defendants' motion to dismiss should therefore be denied.

## STATEMENT OF FACTS

Plaintiff South Carolina NAACP provides free eviction-prevention services, investigates patterns in eviction filings, and advocates for more just eviction policies and practices. Complaint ¶ 6, ECF No. 1. To do so effectively, the South Carolina NAACP must access and record the names and addresses of tenants who have eviction actions filed against them as soon as that information is available in the Public Index. *Id.* ¶ 60. Scraping is the only practicable way of doing so. *Id.*

Scraping is not hacking. Rather, scraping is a method of automatically accessing and recording information that is already available to a manual user. *Id.* ¶ 8. In a manual search, a human user clicks through a website's prompts, enters a query, and captures the results. In an automated search, a human user creates a list of commands that trains a computer to complete the exact same task. A computer trained to search for and retrieve a piece of data behaves the same as a human user in all relevant respects, but without the potential for human error. An automated search and a manual search exert the same strain on a website's resources. Here, the South Carolina NAACP's proposed scraping activities—which only access and record already-public information—would impose no more than a *de minimis* burden on the functionality of the Public Index. *Id.* ¶ 65.

Scraping offers two benefits over manual searches. First, scraping removes the potential for human error. An automated search for new eviction filings ensures that Plaintiff is able to obtain a complete and accurate data set from which they can initiate their advocacy. Attempting the same task through manual searches compromises accuracy and completeness. Second, scraping is far more efficient than repeated manual searches. Because of the enormity of South Carolina's eviction crisis, the South Carolina NAACP needs to retrieve hundreds of new eviction records per day—a task that is impractical for their volunteers to complete, but that would be easily accomplished through scraping. *See id.* ¶¶ 9, 81–82.

Court Administration has prohibited scraping in two ways. First, the Public Index Terms of Service prohibit using "site data scraper[s] or any similar software." *Id.* ¶ 11. Second, for all but two counties in South Carolina, technical measures freeze access to the Public Index when automated activity is detected. *Id.* ¶ 12.

Defendants' Terms of Service and technical limitations on scraping leave the South Carolina NAACP with no alternative ways to access and record the information it needs. *Id.* ¶ 60. The South Carolina NAACP cannot conduct manual searches—either in the Public Index or the court clerk's office—with the speed and accuracy required to identify tenants who need eviction services before they are automatically evicted, *see id.*,[1] and the South Carolina NAACP needs more data than it can collect manually in order to adequately inform the public about systemic issues in eviction filings or discriminatory practices by landlords, *id.* ¶ 82. Court Administration theoretically has a process for bulk data distribution upon request under Rule 610 but, when the South Carolina NAACP tried to make use of the process, Defendants stated that they would not consider providing Plaintiff with the information it requested and ceased to respond to subsequent outreach from Plaintiff to clarify this refusal. *Id.* ¶¶ 72–75. Seeing no

---

[1] Under South Carolina law, tenants whose landlords file eviction proceedings against them must respond to an Order to Show Cause and request a hearing within 10 days. Tenants who fail to do so forfeit their hearing and are automatically subject to judgment against them. ECF No. 1 at ¶ 25; S.C. Code § 27-37-40.

other way to access and record the information Plaintiff needs, Plaintiff filed suit on March 30, 2022.

## LEGAL STANDARD

A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and dismiss the case only where "it appears beyond doubt that the plaintiff can prove no set of facts to support [its] allegations." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 247 (4th Cir. 1993) (citation omitted).

To the extent Defendants' Motion arises under Fed. R. Civ. P. 12(b)(1), the standard is even higher: a court should only dismiss under Rule 12(b)(1) where the jurisdictional allegations are "clearly . . . immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946). Moreover, "when the jurisdictional facts and the facts central to a . . . claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

## ARGUMENT

### I.    Abstention is inappropriate because this case presents an important and justiciable question of federal law.

The doctrine of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" and can be justified only in exceptional situations with the "clearest of justifications." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 819 (1976). Here, Plaintiff has raised a matter that is a core federal concern: whether South Carolina Court Administration is violating the First Amendment to the United States Constitution by prohibiting the South Carolina NAACP from conducting

4

automated searches of publicly available court records. Courts routinely decline to abstain in

First Amendment cases, *see*, *e.g.*, *Zwickler v. Koota*, 389 U.S. 241, 252 (1967), and have

recognized that federalism and comity can be outweighed where, as here, a litigant is asserting

"important federal rights," *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir.

2000) ("[I]mportant federal rights can outweigh the interests underlying the *Pullman* doctrine,"

so "particular caution" is necessary when addressing abstention in a First Amendment case).

Moreover, the relief requested by the South Carolina NAACP is narrow and tailored: an order

authorizing the South Carolina NAACP and its agents to conduct automated searches of public

court records. Because the relief is so limited, the case does not risk "entangl[ing] a federal court

in the operations and internal affairs of the Judicial Branch." ECF No. 12 at 10. None of the

Defendants' three distinct arguments for abstention—based on a generic invocation of

abstention, the *Burford* doctrine, and the *Pullman* doctrine—has merit.

> **A.    Defendants' primary abstention argument is contrary to binding Fourth
> Circuit law.**

First, Defendants rely on *Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir.

2018), to argue that although this case "does not fit neatly" into any particular abstention

doctrine, the Court should nonetheless abstain because the case "implicat[es] the three principles

of equity, comity, and federalism." ECF No. 12 at 10. But Defendants fail to disclose that this

approach was explicitly rejected by the Fourth Circuit in *Schaefer*. There, the Fourth Circuit

explained that "to ensure that abstention remains the exception, not the rule, federal courts may

abstain *only* if a case falls into one of these 'specific doctrines' [of abstention]." *Schaefer*, 2

F.4th 318, 324 (emphasis added) (cleaned up); *see also Martin v. Stewart*, 499 F.3d 360, 364 (4th

Cir. 2007) ("[T]he Supreme Court has *never* allowed abstention to be a license for free-form *ad
hoc* judicial balancing of the totality of state and federal interests in a case."). Defendants'

omission[2] is particularly notable given that *Schaefer* specifically denounces *Brown* as

"inconsistent with [Fourth Circuit] precedent and Supreme Court guidance." *Id.* at 325 n.2.

In light of *Shaefer*, Defendants' unfounded argument for abstention must be rejected.

**B.    The *Burford* doctrine—which "only rarely favors abstention"—does not justify abstention here.**

Defendants' second argument—that abstention is appropriate under *Burford v. Sun Oil Co.*, 319 U.S. 315, 327 (1943)—fares no better. The *Burford* doctrine is an "extraordinary and narrow exception," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996), that can justify dismissal only in a "narrow range of circumstances," *id.* at 726 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 355 (1989) ("*NOPSI*"). A federal court should abstain under *Burford* only:

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*NOPSI*, 491 U.S. at 361 (quoting *Colo. River*, 424 U.S. at 814). The Supreme Court has emphasized that the balance of considerations under *Burford* "rarely favors abstention." *Quackenbush*, 517 U.S. at 728. The touchstone of a *Burford* issue is the presence of an "elaborate and comprehensive scheme of state regulation and review," *Cox v. Planning Dist. I Cmty. Mental Health & Mental Retardation Servs. Bd.*, 669 F.2d 940, 943 (4th Cir. 1982). Archetypal regulatory systems that justify *Burford* abstention include oil drilling permitting, *Burford*, 319 U.S. at 326–27, "cases involving questions of state and local land use and zoning law," *Pomponio v. Fauquier Cnty. Bd. of Sup'rs*, 21 F.3d 1319, 1327 (4th Cir. 1994) (en banc), *overruled in part on other grounds by Quackenbush*, 517 U.S. at 728–31), and state gambling schemes, *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 720–21 (4th Cir. 1999). By contrast, state court rules governing the availability of court records are simple and generally do not

---

[2] Defendants cite *Shaefer* in their brief, ECF No. 12 at 9, 18, but decline to mention its disavowal of *Brown* and of their generalized quasi-abstention argument.

warrant abstention under *Burford*. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 102 (2d Cir. 2004) (rejecting *Burford* because Connecticut Superior Court rules and statutes did "not comprise a complex state regulatory scheme.").

      *Burford* abstention is not warranted here. The South Carolina NAACP's claim is far from a "state law [claim] in federal law clothing." *Johnson*, 199 F.3d at 721. Rather, this case raises a ripe, concrete, and justiciable conflict between the South Carolina NAACP's First Amendment right to access and record public information and Defendants' blanket prohibition against using scraping to access and record the South Carolina Court Public Index. *See Fisher v. King*, 232 F.3d 391, 395 (4th Cir. 2000) (rejecting *Burford* abstention where the challenged provision "is a straightforward blanket exclusion" and "is not susceptible to a limiting construction avoiding [Plaintiff]'s constitutional challenges."). This case does not require the Court to resolve "difficult questions of state law bearing on policy problems of substantial public import," *NOPSI*, 491 U.S. at 361, but rather to determine whether the South Carolina NAACP has a protected First Amendment right to scrape public eviction records and then to evaluate whether Defendants' categorical prohibition on scraping survives strict, "rigorous," or intermediate scrutiny. *See infra* Part II.

      Moreover, courts have consistently concluded that they should not abstain under *Burford* in First Amendment cases. *See Nat'l Ass'n of Gov't Emps. v. Mulligan*, 849 F. Supp. 2d 167, 175 (D. Mass. 2012) ("[T]he developing consensus among federal courts [is] that *Burford* abstention is unwarranted where . . . plaintiffs bring First Amendment challenges to state laws or actions.") (collecting cases); *Felmeister v. Office of Att'y Ethics*, 856 F.2d 529, 534 (3d Cir. 1988) ("[W]e have serious doubts as to whether *Burford* abstention ever would be appropriate where substantial first amendment issues are raised."); *Neufeld v. City of Baltimore*, 964 F.2d 347, 350–51 (4th Cir. 1992) (*Burford* abstention unwarranted with respect to First Amendment challenge to zoning ordinance).

      Although this case involves a state agency in a "peripheral sense," *Neufeld*, 964 F.2d at 351, it is fundamentally a "garden-variety challenge to the federal constitutionality of a state

[practice]," *NC RSOL v. Boone*, 402 F. Supp. 3d 240, 259 (M.D.N.C. 2019) (rejecting *Burford* abstention in challenge to sex offender registry scheme). Therefore, this Court should not abstain on *Burford* grounds.

        **C.**    **The *Pullman* doctrine does not apply because the case does not implicate a state law.**

Defendants' final abstention argument—that jurisdiction is foreclosed under *Pullman*—is also wholly inapposite.

Under *Pullman*, federal courts should abstain from ruling on the constitutionality of an unclear state law where "state court clarification might serve to avoid a federal constitutional ruling." *Nivens v. Gilchrist*, 444 F.3d 237, 245 (4th Cir. 2006). This doctrine achieves two primary goals: "(1) avoiding constitutional questions when their resolution is unnecessary, and (2) allowing state courts to decide issues of state law." *Id.* at 246 n.6 (citing *R.R. Comm. of Tex. v. Pullman*, 312 U.S. 496, 500 (1941)). The Supreme Court has instructed that cases should not be dismissed under *Pullman*, but should be stayed to allow state courts to resolve issues of state law. *See*, *e.g.*, *Bellotti v. Baird*, 428 U.S. 132, 147, 151 (1976) (collecting cases and holding that the district court should have certified an unclear question of state law to the state supreme court); *England v. Louisiana St. Bd. of Med. Exam'rs*, 375 U.S. 411, 469 (1964) (Douglas, J., concurring) ("*Pullman* is a different kind of case. There the federal court does not abstain; it does not dismiss the complaint; it retains jurisdiction while the parties go to a state tribunal to obtain a preliminary ruling—a declaratory judgment—on state law questions.").

Neither justification for *Pullman* abstention is present here. Defendants do not identify *any* question of state law, unclear or otherwise, that could be clarified by the South Carolina courts. Instead, they baldly contend that "a South Carolina court is best positioned to review and interpret the Judicial Branch's policy decisions."[3] ECF No. 12 at 13. But Defendants' "policy

---

[3] In essence, Defendants are insisting that their own subordinates within the Judicial Branch (South Carolina state court judges) are the only parties authorized to review their "policy decisions." If true, that would functionally shelter every policy and practice of South Carolina Court Administration from constitutional review.

decision" to unconditionally ban scraping is not unclear, and cannot be made *more clear* by certification to state court.[4] Court Administration prohibits scraping the Public Index—period.

Instead, as noted, this case does not present a generalized question of what constitutes "best" policy. Rather, it asks a discrete question of federal constitutional law that is resolved by well-worn analytical frameworks, *see infra* Part II.C (strict/intermediate scrutiny). First Amendment cases necessarily require federal courts to "review" state laws and practices—*i.e.*, the state's "policy decisions"—to determine whether they are adequately justified by an identified state interest, *see, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (judging whether a city regulation limiting speech is "narrowly tailored to serve a substantial government interest"), but that does not mean federal courts abstain from First Amendment cases. In fact, the opposite is true. *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 316–17 (1979) ("[P]otential impairment of First Amendment interests strongly counsels against abstention.").

In sum: there is no unclear question of state law here and *Pullman* abstention does not apply.

## II.    The South Carolina NAACP plausibly alleges that Defendants' categorical prohibition on scraping violates its First Amendment right to access and record public court records.

The South Carolina NAACP does not argue that the First Amendment requires Defendants to create the Public Index. But now that Defendants have placed court records in "the stock of information from which members of the public may draw," *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978), they cannot unduly restrict the public's right to access and record that information.

To evaluate Plaintiff's claim, the Court must engage in a stepwise analysis. First, the Court must determine whether Defendants' prohibition on scraping implicates a right protected

---

[4] As noted, *Pullman* ordinarily warrants the certification of a question to state court, not dismissal. But here, Defendants have failed to identify what question of state law, if any, even exists.

by the First Amendment. If it does, the Court must determine whether Defendants' prohibition on scraping survives the relevant standard of scrutiny.

Here, Defendants' categorical prohibition on scraping triggers First Amendment scrutiny for two independent reasons. First, the prohibition infringes on the South Carolina NAACP's right of access to the judicial records at issue in this case, which are public docket entries. *See infra* Part II.A. Second, Defendants' prohibition on scraping infringes on Plaintiff's right to record the public information at issue in this case, including via scraping. *See infra* Part II.B. Analyzed under either theory, Defendants' restriction on scraping triggers *at least* intermediate scrutiny, and, as discussed further below, Defendants' categorical prohibition on scraping cannot satisfy intermediate scrutiny because it is neither justified by an important state interest nor adequately tailored to protect that interest. *See infra* Part II.C.

> **A.      The First Amendment protects the South Carolina NAACP's right to access—including by scraping—the judicial records at issue in this case.**

Under the First Amendment, the public has a protected right of access to certain "judicial records and documents." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988). This right of access exists because "[t]he Supreme Court has recognized that . . . access allows the public to 'participate in and serve as a check upon the judicial process — an essential component in our structure of self-government.'" *Schaefer*, 2 F.4th at 327 (quoting *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596, 606 (1982)). The right of access is qualified and "not absolute," *Globe Newspaper Co*., 457 U.S. at 596; if a right of access attaches to a judicial document, as it does to the docket sheets in this case, then the Court proceeds to the

next step of assessing whether the particular restriction imposed on that document is a violation of the First Amendment right of access, as is the case here. *See infra* Part II.C.[5]

In this case, the court records that the South Carolina NAACP must access so that it can "participate in and serve as a check on the judicial process" are the docket sheets that Court Administration maintains and makes available through the Public Index. In South Carolina, those docket sheets contain the name and address information that will allow the South Carolina NAACP to conduct its outreach and advocacy. And, based on the value of access to docket sheets and in light of the "commonsensical observation that most of the information contained on a docket sheet is material that is presumptively open to public inspection," *Doe v. Pub. Citizen*, 749 F.3d. 246, 268 (4th Cir. 2014), the Fourth Circuit has already held that the public has a protected right of access to civil docket sheets. *Id*. That right of access attaches regardless of how the docket sheets are stored or *how* the public seeks to access them; that is, although the right of access "is not absolute," *Globe Newspaper Co.*, 457 U.S. at 606, its qualified protections apply and "the State's justification in denying access must be a weighty one," *id*.; *see infra* Part II.C. Because the South Carolina NAACP has a right of access to these records—and because Defendants' scraping prohibitions limit access to information about the judicial process— Defendants' denial of access implicates the South Carolina NAACP's First Amendment rights and triggers First Amendment scrutiny.

---

[5] The paradigmatic (and original) example of this two-step process involves sealing trial to protect the privacy of a witness or party. *See Globe Newspaper Co*., 457 U.S. at 606–10. In *Globe Newspaper Co*., the Supreme Court initially determined that there was a protected First Amendment right to access a criminal trial, which was implicated by a state's "mandatory closure rules" that required trial judges to exclude the public during the testimony of any victim who was under the age of 18. After concluding that the right of access applied, the Court then assessed the state's interests in the rule and concluded that the mandatory nature of the rule was essentially overbroad. *Id*. at 608–10.

> **1. The records the South Carolina NAACP seeks to access are civil docket sheets, to which the Fourth Circuit has already concluded there is a public right of access.**

In the Fourth Circuit—and in every circuit to have addressed the issue—the public has a protected First Amendment right of access to civil docket sheets. *See Hartford Courant Co.* 380 F.3d at 93 (collecting cases). "[T]he public and press's First Amendment qualified right of access to civil proceedings extends to docket sheets." *Doe*, 749 F.3d at 268. As *Doe* underscored in reaching that conclusion, "docket sheets provide a kind of index to judicial proceedings and documents, and endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment." *Id.* at 268 (quoting *Hartford Courant Co.* 380 F.3d at 93). "[D]ocket sheets furnish an 'opportunity both for understanding the system in general and its workings in a particular case.'" *Hartford Courant Co.*, 380 F.3d at 95 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980)).

The South Carolina NAACP seeks the same record here for the very same purposes. The Public Index, true to its name, is a repository of docket sheets that are an "index to judicial proceedings and documents." *See* ECF No. 1 at ¶ 45 ("The Supreme Court created South Carolina's . . . Public Index to allow 'the public to access case information and to view and print court documents.'"). In this case, each filing in the Public Index contains those pieces of information that cases have consistently recognized as standard components of docket sheets: the parties to the case, the filings, judicial rulings, and the case's disposition. *See*, *e.g.*, *Doe*, 749 F.3d at 268 ("The docket sheet provides onlookers an overview of the court proceedings and allows

them to ascertain the parties to the case, the materials that have been filed, and the trial judge's decisions.").[6]

That court officials compile the record makes no difference to the right of access that attaches to the Public Index's court records. Docket sheets are *always* the creation of court actors: As *Hartford Courant* described, "[s]ince the first years of the Republic, state statutes have mandated that *clerks* maintain records of judicial proceedings in the form of docket books, which were presumed open either by common law or in accordance with particular legislation." 380 F.3d at 94 (emphasis added). The very point of First Amendment protection for the right of access is, of course, to ensure that the public can access records and proceedings that are usually created and controlled by court actors.[7]

> ### 2.    Neither the means of storing nor the method of accessing these judicial records affect whether there is a First Amendment right of access to them.

The South Carolina NAACP seeks to access electronic judicial records by scraping those records. Nothing about the digital context means that the First Amendment's right of access

---

[6] The Public Index likely tracks addresses in "rule to show cause" cases because an eviction action involves an immediate judicial proceeding: By law, it is the magistrate court that provides notice—in the form of a written show cause order—that must be served on the tenant and informs the tenant of the eviction action. *See* S.C. Code § 27-37-20 ("Upon application by the landlord or his agent or attorney any magistrate having jurisdiction shall issue a written rule requiring the tenant forthwith to vacate the premises occupied by him or to show cause why he should not be ejected before the magistrate within ten days after service of a copy of such rule upon the tenant."). The early stage of the judicial proceeding heightens the need for the right of access here—if the South Carolina NAACP cannot access these records, there may not be additional judicial proceedings for these tenants. *See* ECF No. 1 at ¶¶ 3, 24–26.

[7] Even if this Court were to conclude that the Public Index does not contain docket sheets— which Defendants do not appear to contest (beyond suggesting a meaningless distinction between access to the names and addresses contained in the records rather than access to the judicial records themselves)—the records in the Public Index easily satisfy the experience and logic test from *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*"), for exactly the same reason docket sheets do. Regardless of their label, these records contain information that has historically been subject to public review, and, in this case, has in fact been made public. And, under the logic prong, these records are "much like the docket sheets in *Doe* . . . [b]ecause they allow the public to understand the parties involved in a case, the facts alleged, the issues for trial, and the relief sought," so access to these records, "like access to docket sheets, is crucial to not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary." *Schaefer*, 2 F.4th at 327 (citations and internal quotation marks omitted).

protections do not apply to this case, because the First Amendment's protections turn on the proceeding or record—not the means of storing or accessing those records. "It is access to the content of the proceeding—whether in person, or via some form of documentation—that matters," because the Supreme Court was "concerned with information, not with a particular means of communication." *United States v. Antar*, 38 F.3d 1348, 1359–60, 1360 n.14 (3d Cir. 1994) (emphasis omitted). One form of "access is not a substitute for [another], and vice versa." *Id*. at 1360 n.13.

*Press-Enterprise II* is itself instructive on this point. The two-part "experience and logic" test *Press-Enterprise II* set out assesses whether a "particular process" or a "particular proceeding" should receive First Amendment protections. 478 U.S. at 8 ("The Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question"); *id*. at 9 ("If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches."). But that test does *not* ask whether the format of the proceeding or the means of accessing it have historically been open and "play[] a particularly significant positive role in the actual functioning of the process." *Id*. at 11–12; *see Hartford Courant*, 380 F.3d at 92. So, in *Press-Enterprise II*, the Court concluded that there was a right of access to preliminary hearings, such that the First Amendment limits when courts may seal the transcript of a preliminary hearing—without ever discussing the distinction between a transcript or physically observing the hearing. *See* 478 U.S. at 13 ("We therefore conclude that the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings."); *see id*. at 4–5.

The Fourth Circuit's cases further cement this distinction. For example, in establishing that the right of access reaches civil docket sheets, *Doe* discussed the role of docket sheets—not the format in which the courts maintained them or through which the plaintiff in that case sought

to access them.[8] And, in extending First Amendment protections to "newly filed civil complaints," *Schaefer*'s analysis hinged on the nature and value of those complaints. In discussing the facts at issue there, *Schaefer* noted that the plaintiff in that case sent reporters to the courthouse to collect complaints, but *Schaefer*'s reasoning in no way rested either on how the complaints were made available or how the plaintiff sought to access them. 2 F.4th at 322; *see Courthouse News Serv. v. Planet*, 947 F.3d 581, 598–99 (9th Cir. 2020) (assessing whether county policy violated right of access to electronic complaints).

To argue that the electronic nature of the Public Index or the use of scraping negates any First Amendment protection, Defendants primarily direct this court to *Los Angeles Times v. County of Los Angeles*, 956 F. Supp. 1530 (C.D. Cal. 1996). *See* ECF No. 12 at 19–20. But, beyond predating the widespread digitization of records, that case is not on point, and the Fourth Circuit has squarely rejected all of its underlying reasoning. *Los Angeles Times* involved access to a "flat file" of court data that was "unreadable and therefore unusable by the courts or the general public in that condition," 956 F. Supp. at 1535; to read the data, members of a paid subscriber program received "data specifications . . . to reformat the data so as to make it readable and useable," *id*. The "flat file" data at issue in *Los Angeles Times* was not an electronic docket sheet. And the Fourth Circuit's conclusion in *Doe*—that docket sheets are valuable precisely because they "provide a kind of index to judicial proceedings and documents, and [so] endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment," 749 F.3d at 268 (quoting *Hartford Courant Co.*, 380 F.3d at 93)—unequivocally contradicts the District Court's assessment in *Los Angeles Times* that the "flat file" at issue had limited value as "at most a summary description of case specific information," 956 F. Supp. at 1540.

---

[8] In fact, the sealed docket that the plaintiff sought to access in *Doe* may well have been online: *Doe* refers repeatedly to the "Public Docket," which, in 2014, was likely to have been digitized. In any event, neither the format of the docket nor the means of accessing it played any role in the Court's analysis.

Importantly, the Fourth Circuit has also rejected a related line of reasoning in *Los Angeles Times* that Defendants raise here: that "court records" do not receive protection if they are "not [in] a format 'relied upon or used by judges or court clerks in deciding or tracking cases.'" ECF No. 12 at 19 (quoting *Los Angeles Times*, 956 F. Supp. at 1539–40). *Schaefer* expressly noted that "nothing in the record before us demonstrates that the tradition of access to complaints conditions that access on judicial action." 2 F.4th at 327 (cleaned up). Instead, the Fourth Circuit explained, it is not the case that "the First Amendment right of access to a document never exists independent of and prior to a related judicial proceeding." *Id*. at 326. In any event, in this case the judicial records at issue do reflect *immediate* judicial action—as noted, South Carolina law requires the magistrate judge in an eviction action to provide a written show cause order. *See* S.C. Code § 27-37-20; *supra* 13 n.7. And, in light of the fact that the South Carolina NAACP intends to use the information collected from these docket sheets to inform tenants of the need to request a hearing to avoid defaulting on their evictions, *see* ECF No. 1 at ¶¶ 25, 50, 58–60, the records are clearly tied to continued and ongoing judicial action. *See Hartford Courant*, 380 F.3d at 93 (noting that, if "the information provided by [these] docket sheets were inaccessible," then "the ability of the public and press to attend . . . would be merely theoretical").[9]

"True public access to a proceeding means access to knowledge of what occurred there. It is served not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source." *Antar*, 38 F.3d at 1360. Accordingly, because the public has a right of access to the docket sheets—regardless of how they are stored or accessed—Defendants may not limit

---

[9] Defendants also point to cases involving televising court proceedings, including *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16 (2d Cir. 1984). *See* ECF No. 12 at 22–23. But *Westmoreland* was decided before *Press-Enterprise II* established its test for when judicial proceedings should be open and before appellate courts, including the Second Circuit, extended that protection to civil proceedings and documents filed in civil cases. What's more, televising proceedings is fundamentally unlike scraping, which actually involves "the public's capacity to inspect . . . records" or "to inspect and copy public records and documents." *Hartford Courant Co.*, 380 F.3d at 92; *id*. at 93 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).

or deny the South Carolina NAACP access to those records without triggering First Amendment scrutiny.

### 3. Defendants' scraping prohibitions burden the South Carolina NAACP's right of access and its First Amendment activity.

The Public Index's docket sheets contain information about judicial proceedings with "immediate consequences . . ., consequences that the public must promptly understand if it is to help improve the quality of [the judicial] system by subjecting it to the cleansing effects of exposure and public accountability." *Schaefer*, 2 F.4th at 327 (second alteration in original) (citation and internal quotation marks omitted). By prohibiting the South Carolina NAACP from scraping the Public Index, Defendants prevent the South Carolina NAACP from gathering the records it needs in the timely, comprehensive, and accurate manner that would allow the South Carolina NAACP to respond to the "immediate consequences" of an eviction action and perform the First Amendment-protected outreach and advocacy activity it seeks to conduct. As a result, Defendants' scraping restrictions limit the South Carolina NAACP's right of access.

Contrary to their arguments, Defendants do not escape First Amendment scrutiny by providing the public *some* form of access to the protected document.[10] Instead, the right of access is still burdened if Defendants deny access in a way that "truncate[s] the flow of information to the public" and thereby impedes the public from understanding and participating in the judicial proceeding. *Nixon*, 435 U.S. at 609; *see Globe Newspaper Co.*, 457 U.S. at 604 ("By offering such protection [to the right of access], the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government."). In this way, the application of the First Amendment right of access functions no differently than, for example, standard First Amendment speech protections; in fact, *Globe Newspaper Co.* explicitly noted the existence of "limitations on the right of access that resemble

---

[10] If relevant, the existence of alternative forms of access might bear on whether Defendants' restriction survives First Amendment scrutiny, *infra* Part II.C. *See* ECF No. 12 at 20–22.

'time, place, and manner' restrictions"—which, by nature, are not total denials of access.  457 U.S. at 607 n.17.

The very cases Defendants rely on to argue that their scraping restrictions do not affect the right of access here demonstrate that their restrictions "meaningfully interfere[] with the public's ability to inform itself of the proceeding" and so require First Amendment scrutiny. *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999). *Nixon* concluded that the press did not need "physical access" to tapes entered into evidence because "[t]here simply were no restrictions upon press access to, or publication of any information in the public domain," 435 U.S. at 609: Reporters were "permitted to listen to the tapes and report on what was heard" and "were furnished transcripts of the tapes, which they were free to comment upon and publish." *Id.* And the identical reasoning—that there was no actual loss of information—drove both *Whiteland Woods* and *Fisher*. In *Whiteland Woods*, the plaintiff's "right of access to the . . . meeting was not meaningfully restricted by the ban on videotaping[,]" because the plaintiff could "take notes, use audio recording devices, or even employ stenographic recording. Nothing in the record suggests videotaping would have provided a uniquely valuable source of information." 193 F.3d at 183. And, in *Fisher*, the plaintiff had access to a "complete verbatim transcript" of the relevant proceeding.

*Schaefer* also underscores *Whiteland Woods*' conclusion that the "critical question regarding" a restriction on access "is whether the restriction meaningfully interferes with the public's ability to inform itself of the proceeding." 193 F.3d at 183. At issue in *Schaefer* were partial denials of access to judicial records—delays in receiving complaints. Although the plaintiff there would eventually gain access to the complaints, *Schaefer* still concluded that the delay triggered First Amendment scrutiny, and ultimately violated the right of access, because of the significance of contemporaneous records to the public's understanding of the proceedings. *Id.* at 327–28; s*ee Doe*, 749 F.3d at 272 ("Because the public benefits attendant with open proceedings are compromised by delayed disclosure of documents, we take this opportunity to

. . . emphasize that the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies.").

In this case, Defendants' prohibitions on scraping do "limit[] the underlying right of access" of the South Carolina NAACP to docket sheets and "meaningfully interfere[] with the public's ability to inform itself of the proceeding[s]." *Whiteland Woods*, 193 F.3d at 183. Unlike in the cases Defendants rely on, the South Carolina NAACP does not have equivalent access to the Public Index without scraping; the record here demonstrates that scraping would "provide a uniquely valuable source of information." *Id.* Defendants suggest that the South Carolina NAACP did not avail itself of the Rule 610 process, but Defendants themselves explicitly stated that the Rule 610 process would not allow the South Carolina NAACP to gather the records it needs to fulfill either its outreach or advocacy purposes. ECF No. 1 at ¶¶ 72–75. And manually accessing the information would not just be laborious—given the volume of records, it is impossible, less accurate than scraping, and too slow to ensure that the South Carolina NAACP can reach out to tenants facing eviction in a timely-enough fashion to prevent default judgment. ECF No. 1 at ¶¶ 59–63, 81–82. In short, Defendants' scraping prohibitions limit the South Carolina NAACP's—and, through it, the public's—"access to knowledge of what occur[s]" in South Carolina's judicial proceedings, *Antar*, 38 F.3d at 1360, including critically important information about who is being evicted on a daily basis or over time. So, perhaps especially in this context, one form of "access is not a substitute for [another], and vice versa"—"both [forms of access] are vitally important." *Id*. at 1360 n.13.

The decision to create the Public Index is laudable, but Defendants do not get a pass on the First Amendment when their restrictions on the Public Index limit the South Carolina NAACP's right to access judicial records and, in so doing, interfere with protected First Amendment activity.

B.    **The First Amendment right to record matters of public interest encompasses the right to scrape public court records.**

Defendants' motion to dismiss does not contend with the South Carolina NAACP's allegation that the Public Index's Terms of Service and technical prohibitions on scraping interfere not only with Plaintiff's ability to access judicial records, but also its ability to record publicly available information. *See, e.g.*, ECF No. 1 at ¶¶ 80, 86, 88, 99. The right to record matters of public interest is protected by the First Amendment, and as a form of recording, scraping is protected as well.

1.    **The First Amendment protects the right to record matters of public interest.**

Courts across the country have held that the First Amendment protects the right to record information in various contexts, including "taking handwritten notes about habitat conditions, making an audio recording of one's observation of vegetation, or photographing animals," *W. Watersheds Proj. v. Michael*, 869 F.3d 1189, 1195 (10th Cir. 2017), creating an audiovisual recording inside an agricultural production facility, *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018), recording law enforcement officers performing their duties in public, *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011), and photographing a school walkout, *M.C. Through Chudley v. Shawnee Mission Unified Sch. Dist. No. 512*, 363 F. Supp. 3d 1182, 1195 (D. Kan. 2019).

This is because "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). Recording, as a method of speech-creation that facilitates dissemination, constitutes speech. *See, e.g.*, *W. Watersheds Proj.*, 869 F.3d at 1196 ("An individual who photographs animals or takes notes about habitat conditions is creating speech in the same manner as an individual who records a police encounter.").

Speech on matters of public concern receives "special protection" under the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011). Some courts have explicitly found

that the First Amendment protects the "right to record matters of public interest." *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). Other courts have held that the First Amendment protects the right to record government officials doing their duties in public, because "'the free discussion of governmental affairs' is a paramount First Amendment interest." *Garcia v. Montgomery Cty.*, 145 F. Supp. 3d 492, 507 (D. Md. 2015) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). Indeed, "[e]very circuit court to have considered the question has held that a person has the right to record police activity in public." *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020). "Recognizing that the First Amendment protects the right to record government officials performing their duties enables 'a foremost purpose of the Constitution's guarantee of speech': 'to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them.'" *Dyer v. Smith*, 2021 WL 694811, at *7 n. 9 (E.D. Va. Feb. 23, 2021) (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 600 (7th Cir. 2012)). Moreover, "when we protect the right to record public officials, we protect against the degradation of various other constitutional rights." *Id.* For example, "[b]ecause a cell phone video captured George Floyd's death, the world watched," and the "video and the protests it sparked bent 'the arc of the moral universe . . . towards justice.'" *Id.* (internal quotation marks omitted). The same is true of protecting the right to record public government records.

In this case, the South Carolina NAACP seeks to use scraping to record publicly available information that reflects the workings of South Carolina courts—information that can help the South Carolina NAACP petition government officials and institutions for redress on behalf of clients, but also information that can help the South Carolina NAACP (and other members of the public) hold those same officials and institutions to account for how they perform their functions. Without the ability to record such information, the South Carolina NAACP cannot identify discriminatory eviction practices to address through litigation, ECF No. 1 at ¶ 62, or help tenants timely petition courts to prevent landlords from wrongfully or

unnecessarily evicting those tenants in particular cases, *id.* ¶¶ 58–60. In other words, the South Carolina NAACP cannot "use the channels and procedures of state and federal . . . courts to advocate their causes and points of view[.]" *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972).

> ### 2.    The First Amendment right to record encompasses the right to scrape public records.

The First Amendment right to record protects the South Carolina NAACP's right to scrape the Public Index. Like other types of recording, scraping is a form of speech-creation that enables subsequent speech. "Scraping is merely a technological advance that makes information collection easier; it is not meaningfully different from using a tape recorder instead of taking written notes, or using the panorama function on a smartphone instead of taking a series of photos from different positions." *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 16 (D.D.C. 2018). As a method of recording information, scraping requires a human to identify a source of data, and then relies on technology to gather existing information and output the information in a readily disseminable form. Whereas audiovisual recording is a particularly useful tool for capturing and sharing individual instances of, for example, police brutality, scraping is a useful and necessary tool for capturing large swathes of public data because manual collection is impracticable, error-prone, and slow.

In the same way that "to record [via filming] is to see and hear more accurately," to scrape is to understand vast amounts of data more accurately, rather than to guess and surmise based on the limited quantity of information people can process manually. *See Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017). Scraping thus helps the public stay informed, and "promot[es] the free discussion of governmental affairs." *See Glik*, 655 F.3d at 82. And just as audiovisual recording allows onlookers to scrutinize and share concerning government practices, scraping "has the potential to prevent government abuses through scrutiny or to capture those abuses should they occur." *Garcia,* 145 F. Supp. 3d at 507.

The South Carolina NAACP seeks to harness that potential by gathering data en masse, which is only possible through scraping. This mass data collection on evictions will enable it to identify trends and patterns in eviction filings that will inform its advocacy and potential Fair Housing Act litigation. ECF No. 1 at ¶ 62. "To reach these tenants before they are automatically evicted, the South Carolina NAACP must be able to . . . scrap[e] new eviction filings in the Public Index and record[] the scraped information in an organized manner." *Id.* ¶ 60.

Because Plaintiff's expressive activities—disseminating the scraped data and engaging in eviction-related advocacy and outreach to tenants—are protected by the First Amendment,[11] the recording of that data is protected too. As the Supreme Court has recognized, "laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC,* 558 U.S. 310, 336 (2010). The First Amendment protects the entire process—"not only the right to utter or to print, but the right to distribute, the right to receive, the right to read." *Griswold v. Connecticut*, 381 U.S. 479, 482–83 (1965).

The First Amendment thus requires scrutiny of any restriction that prohibits or prevents the method of creating speech—be it writing, painting, or scraping—just as it protects "the product of these processes"—be it the essay, artwork, or scraped information that constitutes the speech itself. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010); *accord Fields*, 862 F.3d at 358 ("The First Amendment protects actual photos, videos, and recordings . . . and for this protection to have meaning the Amendment must also protect the act of creating that material."). To hold otherwise would be "akin to saying that even though a book is protected . . . the process of writing the book is not." *Animal Legal Def. Fund*, 878 F.3d at 1203; *see also Anderson*, 621 F.3d at 1062 ("The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas.").

---

[11] *See, e.g.*, *N.A.A.C.P. v. Button*, 371 U.S. 415, 429 (1963); *In re Primus*, 436 U.S. 412, 431–32 (1978).

If "[r]estricting the use of an audio or audiovisual recording device suppresses speech just as effectively as restricting the dissemination of the resulting recording," *Alvarez*, 679 F.3d at 596, a targeted restriction on scraping tools suppresses speech just as effectively as restricting the dissemination of the resulting information about trends in the eviction data. Such a prohibition prevents the South Carolina NAACP from effectively exercising its other First Amendment rights, namely speaking out about injustice and petitioning the government for redress through litigation and other advocacy measures.

### C.    Court Administration's categorical prohibition on scraping cannot satisfy First Amendment scrutiny.

Court Administration's categorical prohibitions on scraping trigger First Amendment scrutiny because they interfere with the South Carolina NAACP's right to access public judicial documents and its right to record information. While strict scrutiny should apply,[12] Defendants' prohibitions cannot satisfy any level of heightened scrutiny under the First Amendment. At the very least, Defendants have not demonstrated at this stage either a sufficient government interest or narrow tailoring that would justify dismissing the South Carolina NAACP's claim.

 For example, even if the Court were to treat Defendants' prohibition on scraping as a time, place, and manner regulation subject to intermediate scrutiny, the South Carolina NAACP would still prevail. In *Schaefer*, the Fourth Circuit treated the delay in court clerks' release of newly filed complaints as a time, place, and manner restriction on access, and determined that, to be constitutional, the delays must be "content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." 2 F.4th

---

[12] Strict scrutiny is appropriate where the government enacts a blanket denial on access to public information. The Fourth Circuit has held that "[u]nder the First Amendment . . . the denial of access [to discovery materials under seal] must be necessitated by a compelling government interest and narrowly tailored to serve that interest." *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). Similarly, the Supreme Court applied strict scrutiny to the denial of access to criminal trials. *See Globe Newspaper Co.*, 457 U.S. at 606–07. Without the ability to scrape the Public Index, Plaintiff simply cannot collect and analyze all of the information it needs to support tenants in fighting evictions and engage in meaningful, informed advocacy. The prohibitions on scraping effectively deny Plaintiff access to the Public Index for the South Carolina NAACP, and are therefore subject to strict scrutiny.

318, 328 (4th Cir. 2021) (quoting *Planet*, 947 F.3d at 585). The Ninth Circuit has referred to this type of scrutiny as "'rigorous,' but not strict, scrutiny." *Planet*, 947 F.3d at 596 (quoting *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012)). To satisfy this "rigorous" scrutiny, the Ninth Circuit held that Defendants must show "a 'substantial probability' that [the court's] interest in the fair and orderly administration of justice would be impaired" by the access Plaintiff requests, and "that no reasonable alternatives exist to 'adequately protect' that government interest." *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 14). The South Carolina NAACP has sufficiently alleged that its scraping activities would not impair Defendants' orderly administration of justice and that Defendants have means of serving their interests that would not burden the South Carolina NAACP's First Amendment rights. *See* ECF No. 1 at ¶¶ 65, 94–96.

Defendants would also fail to meet their burden under a more standardized version of a time, place, and manner test, which would require that the prohibition on scraping be narrowly tailored to serve a significant government interest and leave open ample alternative channels for communication. *See, e.g. Ward*, 491 U.S. at 791.

> ### 1. Defendants have not demonstrated a compelling, substantial, or significant governmental interest in prohibiting scraping.

Defendants have no sufficient governmental interest in prohibiting automated searches of already-public records—effectuated either by policy or by technical measures. ECF No. 1 at ¶ 90. In evaluating a motion to dismiss under Rule 12(b)(6), the court must accept the facts as alleged in the Complaint as true. Here, that means the Court must credit the South Carolina NAACP's allegation that its scraping will impose at most a *de minimis* burden on the operations of the Public Index. *Id.* ¶¶ 65, 101. Defendants certainly have not shown "beyond doubt that the plaintiff can prove no set of facts to support [its] allegations" that the prohibitions on scraping serve no government interest, as would be required to grant their motion to dismiss. *See Richmond, Fredericksburg & Potomac R.R. Co.*, 4 F.3d at 247 (alteration in original) (quoting *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989)). Instead, Defendants'

Motion to Dismiss vaguely refers to "the Judicial Branch's interest in regulating its own records and systems," ECF No. 12 at 25.[13]

"[T]he First Amendment right of public access is too precious to be foreclosed by conclusory assertions or unsupported speculation." *In re Providence J. Co., Inc.*, 293 F.3d 1, 13 (1st Cir. 2002). "[A] court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Leigh*, 677 F.3d at 900; *Proj. Veritas Action Fund*, 982 F.3d at 836–37 (refusing to take "the police's own view of whether recording of their work is desirable" as "the measure of whether it causes interference that would justify its total prohibition."). Indeed, in *Schaefer*, even "[e]vidence produced *at trial*" failed to substantiate the clerks' argument that their delays were "necessary or unavoidable." 2 F.4th at 329 (emphasis added). Taking Plaintiff's allegations as true, this Court must decline to dismiss Plaintiff's claim absent any actual and supported justification for Defendants' ban on scraping.

Generalized statements about the need to combat scraping activities—without any evidence of harm—simply cannot support restrictions on First Amendment activities. *Rideout v. Gardner* is instructive on this point. 838 F.3d 65, 67 (1st Cir. 2016). There, the First Circuit considered a statute that prohibited citizens from photographing and publishing photographs of marked ballots. *Id.* While the court recognized that the governmental interest in "the prevention of vote buying and voter coercion" was "compelling in the abstract," "intermediate scrutiny is

---

[13] Defendants suggest in a footnote that the Court could rely upon the Affidavit of Joel B. Hilke, ECF No. 12-1, under Fed. R. Civ. P. 12(d). ECF No. 12 at 6 n.1. But doing so would automatically convert Defendants' motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011). And "[s]uch conversion is not appropriate where the parties have not had an opportunity for reasonable discovery." *Id.* (citing *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985)). Here, Defendants' asserted government interests cannot be accepted as sufficient to satisfy their burden under any tier of First Amendment scrutiny without discovery to establish whether any such interest is in fact compelling, substantial, or important—an assessment which involves material facts in dispute. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc) ("to properly employ an as-applied analysis, the court was obliged to first afford the City discovery."). Because a motion for summary judgment cannot be resolved without discovery in this case, the court should decline to consider the affidavit of Joel Hilke under Rule 12(d). *See* Affidavit of Allen Chaney, filed with the instant brief.

not satisfied by the assertion of abstract interests." *Id.* at 70–71, 72. The court reasoned that "[d]igital photography, the Internet, and social media are not unknown quantities—they have been ubiquitous for several election cycles, without being shown to have the effect of furthering vote buying or voter intimidation." *Id.* at 73. Although "digital photography ha[d] been in use for at least 15 years," the State could not "identify a single complaint of vote buying or intimidation related to a voter's publishing a photograph of a marked ballot during that period." *Id.* (internal quotation marks omitted). Similarly, Defendants have not identified any concrete examples of scraping causing harm to the Public Index.

Furthermore, "even where the government's asserted interests are important it still 'must demonstrate that the recited harms are real, not merely conjectural[.]'" *Proj. Veritas Action Fund v. Rollins*, 982 F.3d 813, 837 (1st Cir. 2020) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality)), *cert. denied,* 142 S. Ct. 560 (2021). In *Project Veritas Action Fund*, the First Circuit considered a law that criminalized recording conversations without consent, including conversations between police officers and civilians in public. 982 F.3d at 817. The government asserted that the law served two governmental interests: "preventing interference with police activities and protecting individual privacy." *Id.* at 836. But the court found that "the mere act of open recording" does not actually "disrupt[] officers in carrying out their duties." *Id.* And the government's other justifications—for example, that "heightened consciousness on the officers' part that recording may be occurring . . . would appreciably alter their ability to protect the public" or that the law "reduces interference with official police responsibilities in any meaningful way"—were unsupported by the record. *Id.* at 836–37. Similarly, the mere act of scraping does not actually impair the functioning of the Public Index or other court operations. *See* ECF No. 1 at ¶ 65.

To be sure, if it were "obvious" that the prohibition on scraping "serve[d] a significant governmental interest," then the government would not be required to provide evidence proving that it did so. *Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020). But it is far from obvious that prohibiting a widely employed technique that merely accesses and records already-

27

public information serves any government interest. In fact, the Greenville and Charleston Public Index websites operate without technical prohibitions on scraping, ECF No. 1 at ¶¶ 42–43, as do many other online docket services, such as the federal PACER system, *id.* at ¶ 93. If technical anti-scraping measures actually promoted a significant interest in the fair and orderly administration of justice, then surely these other websites would have implemented them as well—or would at least be suffering significant harms from their lack of scraping prohibitions.

### 2.     The prohibition on scraping is not narrowly tailored.

Even if Court Administration could identify a sufficient interest in prohibiting scraping, its blanket ban is not narrowly tailored under any level of scrutiny. A regulation must "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). Court Administration's technical measures block access to the Public Index whenever they detect scraping activity, even in the many situations where scraping would have at most a *de minimis* effect on the Public Index's functionality, as is the case with Plaintiff's proposed scraping activities. ECF No. 1 at ¶ 94. And in all cases, anyone scraping the Public Index, regardless of whether they have a *de minimis* effect, is in violation of the terms of service. ECF No. 1 at ¶ 11, 39. The prohibitions thus "unnecessarily sweep[] in innocent individuals and their speech" with the activities of a few allegedly disruptive actors. *McCullen*, 573 U.S. at 492–93.

To show that their restrictions are narrowly tailored, Defendants must, at a minimum, explain why "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. 495. They must "present evidence showing that . . . [they] actually tried or considered less-speech-restrictive alternatives." *Billups*, 961 F.3d at 688 . Court Administration cannot meet this burden.

Indeed, Court Administration did not "actually tr[y] or consider[]" narrower alternatives, *see id.*, such as allowing scraping during designated low-traffic times of day or providing regular

updates on eviction filings. ECF No. 1 at ¶ 72. These less restrictive alternatives are "both possible and practicable." *Schaefer*, 2 F.4th at 329. Instead, Defendants took the broadest, most speech-restrictive route: prohibiting scraping altogether. The government's "failure to select [a] simple, available alternative suggests something about both the veracity of its asserted justification and the reasonableness of its" regulation. *Multimedia Pub. Co. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 161 (4th Cir. 1993).

    Not only is Court Administration's scraping prohibition overbroad, it is also "wildly underinclusive." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018) ("NIFLA"). Because the South Carolina Judicial Department's terms of service are enforceable only against attorneys who are admitted to practice law in South Carolina, other individuals and companies can scrape the Public Index without consequence—and some have done just that. *See* ECF No. 1 at ¶¶ 91–92. There is no reason to believe that in-state data scrapers—much less in-state, data-scraping attorneys—are more likely to destabilize the Public Index than are out-of-state scrapers, and yet the scraping ban burdens only those who, like the South Carolina NAACP, seek to exercise their constitutional right to petition on behalf of South Carolinians. "Such [u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S. Ct. at 2376 (alteration in original).

    **3.    The prohibition on scraping fails to leave open ample alternative channels for communication.**

    There are no alternative channels through which Plaintiff can access and record the information it seeks. Plaintiff can only acquire and use the quantity of information it needs by scraping the Public Index. Like audio and visual recording, scraping is a "uniquely reliable and powerful method[] of preserving and disseminating news and information about events that occur in public." *Alvarez*, 679 F.3d at 607. Scraping automatically collects existing data, and outputs it in an organized manner. ECF No. 1 at ¶ 60. No other tool is powerful enough to give Plaintiff the information it needs to reach tenants before they are subject to a default judgment of

eviction. *Id.* By barring the South Carolina NAACP from scraping the Public Index's records, Defendants prevent the South Carolina NAACP from timely identifying tenants who need information about eviction services and collecting enough data to adequately inform the public about systemic issues in eviction filings or discriminatory practices by landlords. ECF No. 1 at ¶¶ 81–82.

Defendants point to Rule 610 and manual searches of records—in person or in the Public Index—as alternative methods by which Plaintiff could access the information it seeks. ECF No. 12 at 16. What Defendants decline to note is that when Plaintiff asked Court Administration to provide regular updates on eviction filings pursuant to Rule 610, Court Administration refused. ECF No. 1 at ¶¶ 73–75. And manual searches are simply impracticable given the quantity of the data, and the fact that tenants have only ten days from the date an eviction action was filed to request a hearing on that action. *Id.* ¶ 59; *see supra* 16. Scraping data from the Public Index is the only way Plaintiff can reach tenants before they are automatically evicted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss.

Dated:  August 19, 2022                                      Respectfully submitted,

*/s/ Allen Chaney*
Allen Chaney                                                 Joe Schottenfeld*
Fed. Id. 13181                                               Martina Tiku*
ACLU Foundation of South Carolina                            NAACP
P.O. Box 1668                                                4805 Mt. Hope Drive
Columbia, SC 29202                                           Baltimore, MD 21215
Tel.: (843) 282-7953                                         Tel.: (410) 580-5777
achaney@aclusc.org                                           jschottenfeld@naacpnet.org
                                                             mtiku@naacpnet.org

Esha Bhandari*
Sandra S. Park (admitted *pro hac vice*)
Laura Moraff*
American Civil Liberties Union Foundation

125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
ebhandari@aclu.org
spark@aclu.org
lmoraff@aclu.org


*Application for admission *pro hac vice* pending

## CERTIFICATE OF SERVICE

I certify that on August 19, 2022, the foregoing Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss was filed electronically using the Court's CM/ECF system, which effectuates service upon all registered parties.

Dated:  August 19, 2022

*/s/ Allen Chaney*
Allen Chaney
Fed. Id. 13181
ACLU Foundation of South Carolina
P.O. Box 1668
Columbia, SC 29202
Tel.: (843) 282-7953
achaney@aclusc.org